# MARTIN O. WALKER *et al.*

## *v.*

# CHAUNCEY TUCKER *et al.*

1. CONTRACT—*construction of.* In the construction of a contract, where the language is ambiguous, courts uniformly endeavor to ascertain the intention of the parties, and to give effect to that intention; but where the language is unambiguous, although the parties may have failed to express their real intention, there is no room for construction, and the legal effect of the agreement must be enforced.

2. The provisions of a contract must be construed together, so that all the words shall have some effect given them, if possible.

3. By a demise of farming lands a covenant is raised, by implication of law, that they shall be used as such, and in the absence of express covenants in reference thereto, the law also implies covenants on the part of the lessee that no waste shall be committed; that the land shall be farmed in a husbandlike manner; that the soil shall not be unnecessarily exhausted, by negligent or improper tillage, and that repairs shall be made.

4. SAME—*recitals in the preamble, effect of.* Where the words in the operative part of an instrument are of doubtful meaning, the recitals, preceding the operative part, may be used as a test to discover the intention of the parties and fix the true meaning of the words; but when the words in the operative part are clear and unambiguous, they can not be controlled by the recitals.

5. Where the recitals do not express all that is included in the operative part of an instrument, they can not be held to be a full and clear expression of the intention of the parties.

6. SAME—*implied condition, failure of, will excuse performance.* Where one makes a contract to do a thing which, in itself, is possible, he will be liable for a breach of such contract, notwithstanding it was beyond his power to perform it; but where, from the nature of the contract, it is apparent the parties contracted on the basis of the continued existence of a given person or thing, a condition is implied, that if the performance becomes impossible, from the perishing of the person or thing, that shall excuse the performance.

7. Where a lessee of coal mines covenants, by the terms of his lease, to work the same, during the continuance of his lease, in a good and workmanlike manner, he is liable for a breach of his covenant, notwithstanding it may be beyond his power to perform it; but if the coal mines become exhausted, that will excuse him from any further performance.

8. SAME—*demise—eviction by the landlord and its effect as to him in an action for breach of covenant on the lease, against his tenant.* Where an article of agreement, in the reciting part, referred to land described in a lease from one Ledyard to the parties of the first part, and recited that the parties of the first part were desirous to lease to the party of the second part the right of mining for and excavating coal on said premises, etc.; and in the operative part of said agreement the demise was of the *farming lands described and mentioned* in said lease from Ledyard, *together with the right to mine, dig, extract and carry away coal* from the said premises described in Ledyard's lease, *together with the enjoyment and occupation of so much of the surface of said lands* as might be necessary to carry on the mining for coal on said premises: *Held,* that the right to the farming land was as definite and certain as the right to mine for coal, and that if the grantor in said agreement prevented the grantee from using the farming land, it would amount to an eviction, and in an action by the grantor against the grantee for a breach of the covenants in such agreement, a plea setting up that the grantor had prevented the grantee from using such farming lands was a good plea, and it was error to sustain a demurrer to it.

APPEAL from the Circuit Court of Cook county; the Hon. LAMBERT TREE, Judge, presiding.

Mr. JOHN N. JEWETT, and Mr. CHARLES T. ADAMS, for the appellants.

Mr. JOHN VAN ARMAN, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This action is brought to recover for breaches of the covenants contained in the following instrument:

"*Memorandum of an agreement,* made and concluded this 15th of July, A. D. 1865, by and between Chauncey Tucker and Henry Tucker, by Thomas Brown, their attorney in fact, and Thomas Brown, of the city of Buffalo, and State of New York, (partners, under the name, style and firm of Tucker, Brown & Co.) parties of the first part, and M. O. Walker, Jas. Mullins, G. H. Cutting, Amos G. Throop and R. McClelland, of the city of Chicago, in the State of Illinois, com-

posing the Carbon Hill Coal Company, of Ohio, parties of the second part—

"*Witnesseth*, That whereas the said parties of the first part are lessees from Jonathan Ledyard, Caznovia, Madison county, New York, of certain lands lying near the village of Palestine, in the county of Columbiana and State of Ohio, which said lands are more particularly described in a certain article of agreement and lease, made by Ledyard to Chauncey Tucker and Henry C. Tucker, of Buffalo, dated the 2d day of February, 1863, and also an amendment made thereto by the said Jonathan Ledyard, to and with the parties of the first part, above named, bearing date the 5th day of July, 1865, both which lease and amendment thereto are to be of record in said Columbiana county, Ohio, and to which reference is hereby made for the description of the premises herein and hereby referred to and leased. And whereas, the said Tucker, Brown & Co., parties of the first part, are desirous to lease and convey to the said parties of the second part the right of mining for and excavating coal on the said premises during the continuance of said lease and amendment thereto, made by said Ledyard,

"Now, therefore, in consideration of the covenants, conditions, stipulations and rents to be hereinafter fulfilled, kept, done, performed and paid by the said parties of the second part, their executors, administrators and assigns, the said parties of the first part do hereby demise and lease unto the said parties of the second part, their executors, administrators or assigns, the farming lands described and mentioned in the said articles of agreement with and lease from said Ledyard, together with the right to mine, dig, extract and carry away coal from the said premises described in Ledyard's lease and amendment thereto, or any part thereof, together with use, enjoyment and occupation of so much of the surface of said lands as may be necessary to carry on or conduct the mining for coal on said premises, or any part thereof, and also to take, dig and extract from said premises thirty thousand tons of coal

per annum, and, if possible, sixty thousand tons of coal, or over, for and during ten years, from the 15th day of July, 1865, with the privilege of, on the part of the said parties of the second part, to have this lease and agreement extended eight years further, paying for the coal during said last eight years at the rate of forty-five cents per ton ; and also that the said parties of the second part are to have the use and enjoyment of forty good cars, now at the said coal mines, and said premises, together with all the houses, barn by the chute, blacksmith shops and tools, and all other property and fixtures connected with the working of these coal mines, now on the premises, except only the house on the hill, now occupied by Tucker's tenant ; and also the right to have and take from said premises all necessary timber for the use and working of said mines, to be selected from such portion of the premises as the said parties of the first part may designate, and also shall purchase from said parties of the first part all the live stock on the said premises, at prices to be mutually agreed upon by the parties hereto, and in case of disagreement, then a disinterested third person shall fix the value thereof.

"And it is further covenanted and agreed, that the said parties of the second part shall further have, during the further continuance of this lease and agreement, the sole and exclusive right to open and work the vein of cannel coal on said premises, during the continuance of this lease, at fifteen cents per ton, and to have the privilege of erecting buildings for storage and manufacturing purposes, joining said mines ; and that, in case of the rebuilding of the trestle-work on said premises, or a strike of the miners for more than two months, then the time so used in rebuilding said trestle-work, or in the strike of the miners, shall be deducted from this lease, and the same shall be extended for an equal period thereafter.

"And the said parties of the first part do further hereby covenant and agree to and with the said parties of the second part, that they have the lawful right to make this lease ; that said leasehold premises and said personal property are now

free and clear from all incumbrances, rents or liens of every name, nature and kind, and that they will forever warrant and defend the quiet and peaceable possession of the said parties of the second part during the continuance of this lease. And the parties of the first part agree to perform all the covenants and agreements by them to be kept and performed in and by said agreement with and lease from said Ledyard, and fully uphold the estate of said parties of the first part herein, under said lease from said Ledyard.

"And the said parties of the second part do hereby covenant and agree to and with the said parties of the first part, their executors, administrators and assigns, to work the said coal mine, during the continuance of this lease and agreement, in a good and workmanlike manner; to take the necessary timber therefor from such portions of the premises only as the said parties of the first part shall designate; to pay the said parties of the first part, for all coal so taken out during the first ten years, the sum of thirty-five cents per ton, and for cannel coal fifteen cents per ton; payments to be made monthly, at the Bank of North America, in New York, with current rate of exchange, not exceeding one-fourth of one per cent.; and for the remaining eight years at forty-five cents per ton, and fifteen cents for cannel coal; and also will return to the said parties of the first part, at the termination of this lease, the forty cars, and also all the barns, shops, tools, and other personal property on said premises, in the same good order and condition as they are received by them, ordinary wear and tear or inevitable accident excepted; and that they will purchase all the live stock on said premises at prices to be agreed upon between the parties hereto, and in case they can not agree as to their price and value, then they will agree to select some disinterested third person to fix and appraise the value thereof."

Appellants claim that, by the terms of this instrument, they are entitled to the possession and use of the farming lands, in addition to the right to mine for coal, during the term. The

court below held otherwise, and this presents the first question requiring our attention.

In the construction of a contract, where the language is ambiguous, courts uniformly endeavor to ascertain the intention of the parties and to give effect to that intention ; but where the language is unambiguous, although the parties may have failed to express their real intention, there is no room for construction, and the legal effect of the agreement must be enforced. *Benjamin* v. *McConnell,* 4 Gilm. 536 ; *Smith* v. *Brown,* 5 id. 309 ; *Crabtree* v. *Hagenbaugh,* 25 Ill. 232.

The language here employed to describe what is demised is plain and easily understood, and, taken by itself, is free from any ambiguity. It is : *"the farming lands described* and mentioned in the said articles of agreement with and lease from said Ledyard, *together with the right to mine, dig, extract and carry away coal* from the said premises described in Ledyard's lease and amendment thereto, or any part thereof, *together with use, enjoyment and occupation of so much of the surface of said lands* as may be necessary to carry on or conduct the mining for coal on said premises," etc.

The right to the farming lands thus appears to be as definite and certain as the right to mine for coal, nor does it appear that it was granted as a mere incident or accessory to that right, for the right to mine for coal is expressly declared to be "together with"—that is, in addition to the demise of the farming lands, and the right to such incidental use and occupation of the surface as may be necessary for the purposes of mining is conferred by an additional distinct clause.

It is true, in construing an instrument of this character, it must be considered with reference to its object and the whole of its terms ; still, when, by the use of general words, the intention is clearly and unequivocally expressed, the court is bound by it, however capricious it may be, unless it be plainly controlled by other parts of the instrument. 1 Chitty on Conts. (11 Am. Ed.) 122.

The circumstance that no separate rent is stipulated to be paid for the use of the farming lands by appellants, while appellees were required, as is argued, to pay to Ledyard $500 per annum for their use, proves nothing.   The $500 required to be paid by appellees to Ledyard was not for the use of the farming lands alone, but also for the buildings and fixtures thereon, a portion of which, at least, it is admitted are demised to appellants by this instrument, whether the farming lands are or not.   Appellees, too, by that lease, are authorized to build certain houses for the use of miners, repaying themselves therefor by certain coal rents, and are required to pay as rent, for the use of such houses, at the rate of ten per cent per annum on cost ; yet there is no corresponding provision in this instrument, either in reference to the building of such houses or the payment of rent for such as may have been built pursuant to this stipulation.   Appellees are only required to pay Ledyard ten cents per ton for coal, for which, by this instrument, appellants are required to pay appellees forty-five cents per ton.   This margin certainly affords an adequate consideration for the rent of the farming lands and the use of the buildings ; and from the language of the instrument it is clear, beyond doubt, that the forty-five cents per ton to be paid on the coal was not understood as being compensation merely for the privilege to mine for coal, for it is expressly said, "that, in consideration of the covenants, conditions, stipulations and rents, to be hereinafter fulfilled, kept, done, performed and paid by the said parties of the second part, etc., the said parties of the first part do hereby demise and lease unto the said parties of the second part," etc., the "farming lands," etc.   It is an entire, indivisible contract, as much so as is the sale of a farm with the crops, farming implements and live stock thereon, for a specified sum of money for the whole.

Nor are we able to perceive any special significance in the fact that there are no covenants with regard to the care and cultivation of the farming lands.  By the demise of the farm-

ing lands, a covenant is raised, by implication of law, that they shall be used as such (Platt on Covenants, 55; *De Forest* v. *Byrne*, 1 Hilton, 44); and, in the absence of express covenants in reference thereto, the law also implies covenants, on the part of the lessee, that no waste shall be committed; that the lands shall be farmed in a husbandlike manner; that the soil shall not be unnecessarily exhausted by negligent or improper tillage, and that repairs shall be made. Taylor's Landlord and Tenant, sec. 344.

The performance of these covenants would seem to sufficiently protect appellees against liability to Ledyard, on account of the farming lands, except as to the stipulated rent; and there is, therefore, nothing improbable in supposing they apprehended no necessity for special covenants in these respects.

We are unable to discover why it should be presumed that appellants were less desirous of having the use of the farming lands, in connection with the right to mine for coal, than appellees were, when they obtained their lease from Ledyard. In both the lease from Ledyard to appellees and that from appellees to appellants, the paramount object is undoubtedly the right to mine for coal; yet it may also have been desirable to the lessees to have, at the same time, the use of the farming lands. This would avoid all possible conflict that might otherwise arise between the lessees of the different rights; and we are, moreover, unable to say, from any information with which we have been favored on the subject, that the use of the farming lands might not, in other respects, contribute materially to the convenience and profit of the lessees, while conducting their mining operations. It seems, at least, quite as unreasonable, under the circumstances, to suppose that appellees should have desired to retain, as that appellants should have wished to acquire this right.

It is also insisted, that the fact that appellees reserve the right to direct from what portion of the premises the appellants should take wood during the term, shows that it was

not understood that they had parted with their control over the farming lands. This inference is by no means necessary.

In the lease from Ledyard to appellees, it is provided, "timber may be cut on the farm for mining uses, and for necessary firewood, and repairs and improvements on the premises, but the party of the first part may direct from what place it shall be taken." To enable appellees, therefore, to comply with this, it was indispensable that they retain the right to direct from what part of the premises appellants should take wood during the term.

A further objection urged is, that if the right to the use and occupation of the farming lands was granted to appellants, then all the interest appellees had in the premises was gone; and that appellees having retained no reversionary interest in the premises, this, instead of having been a subletting, would have been an assignment of appellees' term, but that the language used shows that it was not the intention of the parties to assign an unexpired term, but merely to sub-let an interest in the term which appellees held, and the understanding must, therefore, have been that appellees still retained the farming lands.

This objection is not well founded. It is not pretended that the lease by appellees to appellants covered the entire interest or estate leased by Ledyard to appellees. The house occupied by Tucker's tenant is expressly reserved by appellees. Besides this, appellees reserve the right to direct from what part of the premises wood shall be cut, and appellants are required, at the expiration of the term, to return to appellees "the forty cars, and also the barns, shops, tools and other personal property on said premises," etc.

If, however, we were to concede that the transfer by a lessee of the unexpired term of a part of the premises held by him constitutes an assignment, instead of a sub-letting, the principle, when applied to the facts before us, does not sustain the position contended for. The whole of the unexpired term for mining is admitted to be transferred; and it is not,

536          WALKER *et al. v.* TUCKER *et al.*          [Sept. T.

Opinion of the Court.

nor can it be claimed, that the right to the occupation and use of the farming lands is a reversionary right, to take effect only upon the expiration of the term for mining. It exists *in presenti*, and is totally disconnected from the right to mine.

But it is finally claimed, that it is conclusively shown, by the recitals preceding the operative part of the instrument, that it was only the intention of the parties to convey the right to mine for coal. It is true, this is the only purpose therein expressed; yet it is equally true, that this falls short of expressing all that was in fact conveyed. By the operative part of the instrument, as has been seen, it is expressly said that there is demised and leased "the use and enjoyment of forty good cars, now at the said coal mines, together with all the houses, barn by the chute, blacksmith shops and tools, and all other property and fixtures connected with the working of these coal mines;" and the appellants are also thereby obligated to purchase of appellees "all the live stock on the said premises," etc. It is not pretended that these words are inoperative, and that appellants acquired through them nothing but the right to mine for coal; nor can it be said that this property would have passed to appellants, as an incident to the right to mine for coal, had the language quoted not been used. Unquestionably this property was deemed valuable and important in connection with working the mines, nevertheless it was not indispensable. The mines might have been worked without it. Even if property of this kind had been indispensable to successfully working the mines, still this particular property could not have been, for it is evident, from the description, that its place could have been supplied from other sources.

Inasmuch, then, as the recitals do not express all that is included in the operative part of the instrument, it is impossible that they should be held to be a full and clear expression of the intentions of the parties. The omission of the farming lands can be no more significant than the omission of the blacksmith shops and tools, and live stock.

The rule of law applicable is, where the words in the operative part of an instrument are of doubtful meaning, the recitals may be used as a test to discover the intention of the parties, and fix the true meaning of those words; but where the words in the operative part of the instrument are clear and unambiguous, they can not be controlled by the recitals. 1 Chitty on Conts. (11 Am. Ed.) 120–1 ; *Walsh* v. *Trevanion,* 15 Q. B. 733 (69 E. C. L. 733).

We do not perceive any necessary repugnancy between the provision granting the farming lands and the one granting the use, enjoyment and occupation of so much of the surface of the lands, in which the right to mine is granted, as " shall be necessary to carry on or conduct the mining for coal on said premises," etc.    The former does not include the latter. They must be construed together, so that all the words shall have some effect given to them if possible.    It would seem to be obvious, then, that the intention was, that the use of the farming lands should be limited by the right to use the surface of so much of them as should be necessary to carry on or conduct the mining for coal.

If the whole surface of the farming lands had been absolutely and unconditionally granted, to be used for carrying on and conducting mining for coal, the objection might have been tenable ; but in that event, appellees would have had no more right to withhold the possession of the farming lands from appellants than if they had been conveyed as farming lands, for their possession would have been as essential to the enjoyment of the right in the one case as in the other.

We do not, upon the whole, feel authorized to place any other construction upon the operative words of this instrument than what, to our apprehension, they plainly and unequivocally import.    We are not to presume that unambiguous and appropriate language, to express one thing, was used to express something entirely different, or nothing at all.    If it be true that this language was inserted by inadvertence or through misapprehension, and it does not· express the real

intention of the parties, the remedy is in equity, by bill to reform the instrument. It can not be reformed in this proceeding.

We can not concur in the construction given by the circuit court, but must hold that the right to the possession and use of the farming lands is given to appellants, in addition to the right to mine for coal.

The 2d, 3d, 4th and 5th pleas of appellants were as follows:

" 2. Said defendants say *actio non*, etc., because they say plaintiffs, after the making of the said demise in the said declaration mentioned, and before the happening of any of the supposed breaches of covenant in declaration assigned, to-wit, on July 15, 1865, at, to-wit, the county and State aforesaid, with force and arms, etc., wrongfully and unlawfully withheld from possession of said defendants and Mullins, and Cutting, deceased, the surface of the farming lands parcel of the said demised premises in declaration alleged to have been demised, and refused to let defendants and Mullins and Cutting into their possession thereof, and have from thence hitherto, though often requested to deliver up to them the possession thereof, withheld from them the possession of the surface of the farming lands parcel, etc., and have refused to let them into the possession thereof, etc.

" 3. Said defendants say *actio non*, etc., because they say plaintiffs, after the making of demise in declaration mentioned, and before the happening of any of the supposed breaches assigned, to-wit, on July 15, 1865, at county and State aforesaid, with force and arms, etc., entered into and upon the surface of the said demised premises in the said declaration alleged to have been demised, in and upon the possession of defendants and Mullins and Cutting, and ejected, expelled, put out, evicted and amoved, and kept them so ejected, etc., from the possession thereof from thence hitherto, etc.

"4.  Said defendants say *actio non,* etc., because they say that plaintiffs, after the making of said demise, and before any alleged breaches, on, to-wit, July 15, 1865, at county and State aforesaid, with force and arms, etc., wrongfully and unlawfully withheld from said defendants and Mullins and Cutting a large portion of said demised premises, to-wit, five hundred acres of the land in the articles of agreement demised, and refused to let them into possession thereof, and from thence hitherto, although often requested, etc., wrongfully and unlawfully withheld from them said large portion of said demised premises, to-wit, five hundred acres of the land in said articles of agreement demised, and have refused to let them into possession thereof, etc.

"5.  Said defendants say *actio non,* etc., because they say that plaintiffs, after making of said demise in declaration mentioned, on, to-wit, July 15, 1865, at, to-wit, county and State aforesaid, with force and arms, etc., wrongfully and unlawfully withheld from possession of defendants and Mullins and Cutting a large portion of demised premises, to-wit, five hundred acres of the land in said articles of agreement demised, and refused to let them into the possession thereof, and have from thence hitherto, with force and arms, wrongfully, etc., withheld from the possession thereof, and refused to let into the possession thereof, though often requested, etc., said defendants and Mullins and Cutting; and said defendants aver that annual rental value of that portion of the demised premises so withheld as aforesaid was and is the sum of, to-wit, $50,000, amounting, from July 15, 1865, to commencement of this suit, to, to-wit, $350,000, in which said sum plaintiffs were, at the time of commencement of this suit, and still are, indebted to defendants and Mullins, survivors of Cutting, for the use and occupation of the portion of the demised premises so withheld as aforesaid, which sum exceeds the damages sustained by plaintiffs for supposed breaches of covenant assigned, and said defendants offer to set off, etc."

The court below sustained demurrers to each of these pleas.

Construing the instrument upon which suit is brought, as we do, as conveying the farming lands connected with the demised premises to appellants during the entire term, it is impossible to sustain this ruling.

In *Smith et ux.* v. *Wise & Co.* 58 Ill. 141, suit was brought to recover the amount of monthly rent claimed to be due for certain premises which had been leased by the plaintiffs to the defendants. The defense was, that, before the expiration of the term for which the premises were leased, the plaintiffs had, without the consent of the defendants, taken possession of a large part of them, thereby virtually evicting them. The evidence tended to establish that fact, and the court gave to the jury, among others, the following instructions:

"The principle upon which a tenant is required to pay rent, is the beneficial enjoyment of the premises, unmolested in any way by the landlord; and if the jury believe, from the evidence in this suit, that the plaintiff took possession of any part of the premises leased by her to the defendants, against their consent, then, in law, it is an eviction, and releases the defendants from the payment of any more rent, and they will find for the defendants."

"Although the jury may believe, from the evidence, that the defendants have never been disturbed in or evicted from the main building on the leased premises, and that they have had the use and enjoyment of the same, still, if they further believe, from the evidence, that the plaintiff has taken possession of any material part of said demised premises, without the consent of the defendants, then the law is, it is an eviction, and the defendants are not bound to pay any rent for the part of the said premises they used and occupied, and the jury will find for the defendants."

These instructions were held to be correct, and in harmony with the previous decisions of this court.

Subsequently, in *Hayner et al.* v. *Smith et al.* 63 Ill. 473, it was said, that, on further reflection and a closer examination of the authorities, the instructions above quoted required some modification, and it is then added: "As was said by the Court of Common Pleas, by JERVIS, Lord Chief Justice, in *Upton* v. *Townsend,* 84 Eng. C. L. 30, and *Same* v. *Greenless,* ib., it is extremely difficult, at the present day, to define, with technical accuracy, what is an eviction. The word 'eviction' was formerly used to denote an expulsion by the operation of a title paramount, and by process of law. But that sort of an eviction is not necessary to constitute a suspension of the rent, because it is now well settled, if the tenant loses the benefit of the enjoyment of any portion of the demised premises by the act of the landlord, the rent is thereby suspended. The term 'eviction' is now popularly applied to every class of expulsion or amotion." This eminent judge further says: "I think it may now be taken to mean this: not a mere trespass and nothing more, but something of a grave and permanent character, done by the landlord with the intention of depriving the tenant of the enjoyment of the demised premises." It is also further added, quoting from WILLIAMS, Justice, in the same case in which the opinion quoted from JERVIS was given, "There clearly are some acts of interference by the landlord with the tenant's enjoyment of the premises, which do not amount to an eviction, but which may be either acts of trespass or eviction, according to the intention with which they were done. If those acts amount to a clear indication of intention on the landlord's part that the tenant shall no longer continue to hold the premises, they would constitute an eviction." And the court below was directed to instruct the jury, upon the further trial of the case, in conformity with these views.

The gist of the defense presented by these pleas is, that the tenants were, by the wilful and tortious act of the landlords, deprived of the use of a part of the premises from the commencement of the term. There is no room for doubt as to

542　　　　WALKER *et al.* v. TUCKER *et al.*　　　[Sept. T.

Opinion of the Court.

the character of the act or the intent of the landlords. The facts alleged are clearly within the principles announced in *Hayner et al.* v. *Smith et al. supra,* and the court below erred in sustaining the demurrers.

The next point urged by appellants is, that the court below erred in sustaining the demurrer to their 16th plea. The defense attempted to be set up by that plea is in answer to the 6th breach of covenant alleged in the declaration. The substance of that breach is, that appellants, on the 15th day of September, 1871, suspended their mining operations upon the demised premises, and abandoned the working of the mines, etc.

The plea alleges that, "on the said 15th day of September, 1871, the mines became and were wholly exhausted and incapable of yielding, when worked in a good and workmanlike manner, and with reasonable skill, care, diligence and energy, sufficient coal to pay for working said mines," etc. If the plea had stopped short, after alleging that the mines became and were wholly exhausted, it would have been good, but the subsequent qualification shows that these words do not mean exhausted of coal, but only exhausted of such coal as was capable of yielding, "when worked in a good and workmanlike manner, and with reasonable skill, care, diligence and energy, sufficient coal to pay for working said mines." This might be, and yet the most valuable portion of the mine remain untouched. It might be the result of the peculiar state of the market, and in nowise attributable to the difficulties to be encountered in mining; but, from whatever cause the result, it is a sufficient answer, that the courts must enforce contracts as the parties make them. They can not superadd conditions or restrictions which the parties have not themselves thought fit to impose, in making their contract. There is nothing in this instrument which authorizes a suspension or abandonment of mining because it has become unprofitable.

As the case must be reversed for the error in sustaining the demurrer to the 2d, 3d, 4th and 5th pleas of the appel-

lants, it is unnecessary to express any opinion as to the weight or preponderance of the evidence; and, so far as the questions arising upon the giving and refusing of instructions are concerned, we deem it sufficient to indicate, in general terms, our opinion upon the law applicable to the case as presented on the trial in the court below, without critically examining the phraseology of each instruction given and refused.

The appellants are expressly bound by their covenant, "to work the said coal mine during the continuance of this lease and agreement in a good and workmanlike manner." It was incumbent on appellants to know, and the presumption is they did know, when they made this covenant, the difficulties to be encountered in performing it. It is elementary law that, when the contract is to do a thing which is possible in itself, the promiser will be liable for a breach thereof, notwithstanding it was beyond his power to perform it, for it was his own fault to run the risk of undertaking to perform an impossibility, when he might have provided against it by his contract. 1 Chitty on Conts. (11 Am. Ed.) 1074.

But where, from the nature of the covenant, it is apparent the parties contracted on the basis of the continued existence of a given person or thing, a condition is implied that, if the performance became impossible from the perishing of the person or thing, that shall excuse such performance. Id. 1076.

If, therefore, the coal mine was exhausted, the appellants were excused from further working it.

Whether a coal mine is exhausted or not, is a question of fact to be determined by the jury, from the evidence, and, in determining this question, since the parties are always supposed, in entering into a contract, to have reference to the known usage and custom which enters into and governs the business or subject to which it relates, it would be proper to hear evidence of any known usage or custom relating to this question, and showing when a mine is deemed exhausted. There is nothing in this lease which shows that the coal to be mined was to be adapted to the demands of any particular

market, or that it should be of any peculiar quality, other than what is described by the words "bituminous coal," and "cannel coal," and the law does not allow the court to presume the existence of conditions or qualifications in this respect.

We perceive no necessity for noticing any other questions presented by the record.

The judgment of the court below is reversed, and the cause remanded with directions to that court to overrule the demurrers to the 2d, 3d, 4th and 5th pleas of the appellants, and allow appellees to plead over.

*Judgment reversed.*

Mr. JUSTICE McALLISTER, having been of counsel, took no part in the decision of this case.