### Max Hottellet, Appellee, v. American Corn Milling Company, Appellant.

#### Gen. No. 15,362.

CONTRACTS—*what does not excuse nonperformance.* In the absence of a saving clause the destruction of a plant by fire does not excuse the nonperformance of a contract providing for the delivery of merchandise.

Appeal from the Municipal Court of Chicago; the Hon. JOHN H. HUME, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1909. Affirmed. Opinion filed March 3, 1911.

WILLIAM GARNETT, JR., and WILLIS E. THORNE, for appellant.

Edmund J. S. Cummings, for appellee.

Mr. Justice Clark delivered the opinion of the court.

This is an appeal from a judgment of the Municipal Court of Chicago, the case being of the first class and having been tried before the court without a jury.

The appellant contracted with appellee to sell and deliver to it 1100 tons of hominy feed, 550 tons at $22.10 per ton, and 550 tons at $23.10 per ton. After appellant had delivered 70 to 80 tons of hominy feed, the mill of appellant in Chicago was destroyed by fire, without any fault on its part. The court found that there was an unconditional agreement on the part of appellant to sell, and on the part of the appellee to buy, the full amount of 1100 tons; that because of the non-delivery, appellee was obliged to go into the open market and purchase the hominy feed so not delivered by appellant, at a cost to himself of $1,312 more than he would have been obliged to pay the appellant on the contract, and rendered judgment for that amount. Appellant introduced two letters as evidence of the contract of July 16, 1907, as follows:

"Chicago, July 16, 1907.

"Hottellet & Co.,
    Milwaukee, Wis.
Gentlemen:

I hereby confirm sale to you of 550 tons hominy feed in second-hand 100-lb. sacks, for September shipment, delivered dock Chicago, at $22.10 per ton.

Thanking you for the order, we are
                        Yours very truly,
                        American Corn Milling Co.,
                                J. D. Vincent,
                                        Secy."

"Milwaukee, Wis., July 16, 1907.

American Corn Milling Co.,
    Chicago, Ill.
Gentlemen:

We hereby confirm conversation we had with you over the long distance phone, resulting in the purchase

of 550 American tons of 2000 lbs. of sack white hominy feed in 100 lb. sacks, delivered any dock in the City of Chicago which we may name, at $22.10 per ton, sacked; sacks to be included in price. To be shipped in the month of September or earlier if it suits you better.

Please confirm and oblige.

Yours truly,

HOTTELLET & Co."

The appellee introduced two letters as evidence of the contract of August 7, 1907, as follows:

"CHICAGO, August 7, 1907.

HOTTELLET & Co.,
    Milwaukee, Wis.

GENTLEMEN:

We hereby confirm sale to your Hottellet of 550 tons hominy feed at $23.10 per ton, in 100 lb. sacks, sacks included, delivered dock, Chicago, for September shipment.

Please confirm the above and oblige.

Yours very truly,

AMERICAN CORN MILLING Co.,

Per J. D. VINCENT,

Secy."

"MILWAUKEE, WIS. August 8, 1907.

AMERICAN CORN MILLING Co.,
    Chicago, Ill.

GENTLEMEN:

We hereby confirm purchase of our Mr. Max Hottellet of 550 tons of hominy feed at $23.10 per ton, in 100 lb. sacks, sacks included in price, delivered dock Chicago, for September shipment.

Yours truly,

HOTTELLET & Co."

The appellee introduced the following letters as evidence of modification of former contracts and promise to pay losses:

"Milwaukee, August 23, 1907.
(In re claim Hottellet & Co.)
American Corn Milling Co.,
    Chicago, Ill.
Gentlemen:

With reference to the claim of Hottellet & Co., arising out of your refusal to deliver 1100 tons of hominy feed sold for September delivery, would say that while Hottellet & Co. deplores the fact that you had the misfortune of having your mill destroyed by fire, yet nevertheless we cannot see why we should stand the loss which will accrue out of your failure to fulfill this contract, and will therefore insist that you stand whatever loss there is.

Hottellet has no desire to profit by your misfortune. As I told you in our interview yesterday, Hottellet & Co. sold this hominy feed for export, and the buyer demands the fulfillment of the contract.  Mr. Hottellet bought $500 of hominy feed yesterday at $24. per ton. Up to the present writing he has been unable to purchase any more.

Upon leaving your office yesterday, upon inquiry I found that you have your corn elevator insured for $25,000; that you carry $1500. insurance on machinery and $1750. on stock.

I sincerely hope that some arrangement can be made whereby this matter will be amicably adjusted.

An early reply will greatly oblige
                    Yours very respectfully,
                              A. Hubschmann."

"Chicago, August 24, 1907.
Hottellet & Co.,
    Milwaukee, Wis.
Dear Sirs:

Mr. Adolph Hubschmann wrote us under date of yesterday in reference to your claim against us.  We can only say that we sold this feed, as you know, upon the expectation that we could manufacture the feed. Not being dealers in feed made by other people, all that we can say is that you may go into the market and buy feed for the best terms you can make for feed to be delivered on the same terms agreed to be sold to you by us.

We have no other assets excepting the insurance and the ground on which the mill stood, all of which is heavily mortgaged, to the amount of which the insurance will have to be applied.

Just as soon as matters will straighten themselves out, we will try to do what is right, and meantime hope you will bear with us.

Yours truly,

AMERICAN CORN MILLING CO.,

per J. W. VINCENT,

Secy.''

Evidence was introduced by appellant showing the prior correspondence and dealing between the parties, and claim is made by it that this evidence demonstrates the fact that it was the intention of the parties that the hominy feed should come from the mill of the appellant, and from no other source, and that because of the burning of appellant's mill it was relieved from further performance of the contract on its part. We agree with the appellant that the court should construe contracts of sale in the light of the acts of the parties, their situation, intentions and purposes, their relation to each other and to the property which was the subject-matter of the contract, their prior course of dealing and the surrounding facts and circumstances. We also agree with the appellant,—as we gather from the record the trial court did—that the letter of August 24, 1907, above set forth, did not give the appellee any additional rights; that even if that letter could be construed to be an agreement on the part of the appellant to pay the claim of appellee, it was not supported by any additional consideration moving from the appellee.

The remaining question, therefore, to be decided is whether the performance of the contract on the part of the appellant was excused by the destruction of the appellant's mill without its fault.

The appellant bases its argument on this contention largely upon the case of Emerich Co. v. Siegel, Cooper

& Co., 237 Ill. 610.  The facts in this case were substantially as follows:  The Martin Emerich Outfitting Co. entered into a written contract with Siegel, Cooper & Co., whereby the entire third floor of the buildings known as 211, 213 and 215 State street and the south twenty-five feet front of the third floor of the main building, corner State and Adams streets, should be set apart by Siegel, Cooper & Co. for the Emerich Co., for the sale by the Emerich Co. of furniture and other articles.  Goods were to be sold in the name of Siegel, Cooper & Co.  That concern was to make deliveries and handle the goods sold.  The Emerich Co. was to pay a certain rental for the space, fixed at the sum of $500 per month, and in addition thereto 5% of the gross sales in excess of $75,000 during any year.  After the Emerich Co. had occupied the space for several months the building burned and Siegel, Cooper & Co. conducted their business at another location.  They refused to give the Emerich Co. space in the new location.  In holding that there could be no recovery by the Emerich Co. against Siegel, Cooper & Co., the Supreme Court said:

"In contracts to whose performance the continued existence of a particular person or thing is necessary, a condition is always implied that the death or destruction of that person or thing shall excuse performance. Thus, contracts for the performance of personal services terminate upon the death of the party by whom the services are to be performed.  (Smith v. Preston, 170 Ill. 179).  A covenant by a lessee of a coal mine to work the same for the period of ten years under his lease is discharged by the exhaustion of the mine. (Walker v. Tucker, 70 Ill. 527).  Under a contract to place certain machinery in a particular building, the building and the machinery having been destroyed by accidental fire before the completion of the contract, it was held that both parties were excused from further performance of the contract.  (Appleby v. Meyers, L. R. 2 C. P. 651; Siegel, Cooper & Co. v. Eaton & Prince Co., 165 Ill. 550; Huyett & Smith Manf. Co. v.

Chicago Edison Co., 167 *id.* 233). A contract to let at a stated daily price a music hall for giving a series of concerts was held to be conditional upon the continued existence of the hall and was put an end to by the destruction of the hall by fire. (Taylor v. Caldwell, 3 B. and S. 826). A lease of rooms in a building is terminated by the destruction of the building by fire; (Kerr v. Merchants' Exchange Co. 3 Edw. Ch. 333; Alexander v. Dorsey, 12 Ala. 12; Winton v. Cornish, 5 Ohio, 477); and in case a new building is erected having a similar space in the same location as in the old building, tenant is not entitled to occupy it. Stockwell v. Hunter, 11 Metc. 456.''

We do not find in the case from which the above quotation is made, or in any of the cases referred to in the quotation, any authority warranting us in reversing the judgment in this cause. It is true the appellee may have expected that the hominy feed would come from the mill of the appellant. It appears in the record that after the making of the contract, appellee wrote several letters to the appellant, asking for a sample of the germ of corn, which appellee, who was a broker, desired to get for one of his customers; and that appellee had a conversation with the foreman of the mill, showing that appellee knew, or at least expected, that appellant would ship the feed from its mill in Chicago, and asking that the next car be shipped via. a certain line and later that appellee asked that all the hominy feed be delivered to a certain other line, and giving directions as to the billing; that appellee on July 17, 1906, about a year before the present contract was made, asked for a price f. o. b. appellant's mill. There were other letters passing between the parties before the making of this agreement, which tend to show that the appellee knew that the appellant had a mill, and his evident expectation that the feed would be shipped from the mill. There is also testimony tending to show that appellee was informed by the appellant that it was a manufacturer simply, and did not buy and sell feed. Reference to the corre-

spondence constituting the contract shows that no qualifications were incorporated in the contract, whereby the appellee should be excused from delivering the feed, by reason of fire, strikes or any other unexpected occurrence.

The feed appears to be an ordinary commercial product which may be purchased in the open market, which fact was evidenced by the ability shown by the appellee to supply his customers by resorting to the open market. In doing so, however, he was obliged to pay more than he would have had to pay appellant. While the letter from appellee to appellant, dated August 24, 1907, did not constitute a new contract, it does show, in a measure, the construction placed upon the contract by the appellee. The expression "you may go into the market and buy feed for the best terms you can make for feed to be delivered on the same terms agreed to be sold to you by us," and the further expression in their letter—"Just as soon as matters can straighten themselves out, we will try to do what is right, and meantime hope you will bear with us" can have no meaning unless it be that the Milling Company expected Hottellet to buy the feed elsewhere, with the understanding that the Milling Company would pay the difference in the price. Hottellet could have gone into the market without any permission from the Milling Company, and if, as appellant claims, the clause first quoted above was merely a piece of advice, it was upon a matter so patent that one business man would hardly feel it necessary to offer advice upon it to another. The construction that the parties themselves place upon a contract is often very helpful in determining the construction that should be placed upon it by the court.

Finding no error in the record, we affirm the judgment.

*Judgment affirmed.*