ELIJAH R. MOREHOUSE, respondent,

*v.*

JOHN M. KELLY CONTRACTING COMPANY, appellant.

[Decided October 5th, 1923.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

"In this suit complainant, an employe of defendant corporation under a written contract of employment, seeks an accounting to determine the amount due him from defendant under the terms of that contract. Defendant claims that complainant has been overpaid and counter-claims. By the contract between the parties complainant was to be paid a fixed salary (which salary has been paid), and in addition thereto ten per cent. of the annual net profits of the corporation; settlement of the amount due as commissions on the profits were to be made between the end of each calendar year and February 15th of the succeeding year. It is touching these commissions that this dispute arises.

"A reference has been made to a master before whom testimony on behalf of the respective parties has been taken at great length. The master has stated an account between the parties and reported to this court his findings and conclusions in which he determines that there is due to complainant from defendant for commissions on the net profits of the year 1918 the sum of $1,915.27 and for commissions on the net profits for the year 1920 the sum of $2,854.42, in all the sum of $4,769.69; and that nothing is owing from complainant to defendant.

"Defendant corporation has filed forty-six exceptions to the master's report. These will be considered herein by reference to their serial numbers, without the burdensome process of quoting the several exceptions.

"The learned master has, at the commencement of his report, made a statement of the specific issues between the parties which is so full and accurate that it may be here adopted to avoid unnecessary repetition. This statement of the master extends to page 19 of his typewritten report, at which point he reaches a discussion of the settlement made in February, 1919, for the calendar year 1918. In this preliminary statement of the master he includes findings of fact and conclusions of law which I have adopted without reservation and which may be advantageously read as a part of these conclusions. This portion of the report of the master finds that complainant became entitled to no part of the profits

of the business of the year 1916 because no net profits were earned; and that complainant became entitled to $7,801.36 as ten per cent. of the net prots earned by defendant during the year 1917, and that complainant was paid that amount as his percentage of earnings in the settlement made for that year

"Up to that point of time there appears to be no substantial dispute between the parties. Their material differences begin touching the earnings of the years 1918, 1919 and 1920.

"It will be observed by the statements of the master, already referred to, that a major part of the controversy between the parties is due to different construction placed by them on certain terms of the contract. These terms are: Defendant 'agrees to pay the second party [complainant] ten per cent. of the net profits of said business as evidenced by the books of the company during the period of said employment. The said net profits are to be computed and accounted for annually between January 1st and February 15th of each year, beginning with the year 1917.'

"Complainant claims that this stipulation contemplates that he shall receive his specified percentage on the net profits actually earned in each year and that these profits shall be ascertained and the percentage paid at the end of each year and before February 15th following. Defendant claims that under this stipulation the settlements must be made by the books as kept by it, and that defendant was accordingly privileged to keep its books under a system of bookkeeping whereby profits which are actually made on a contract in the year 1918 were not entered on its books as profits of that year, providing the contract was not fully completed in 1918; thus crediting the entire profits of such a contract in the year 1919 when the contract should be finished, even though it may have been almost finished in 1918. It is claimed by defendant that that practice is a recognized system of bookkeeping and that the adoption of that system is peculiarly a prerogative of defendant and a matter of no proper concern to others.

"It is necessarily a matter of choice on the part of a construction corporation whether it keeps its books of account

by a system which credits at the end of each year as earned a proportionate part of the profits of an unfinished contract based on the percentage found to represent the profits made on that job during the calendar year, or whether it merely enters in an account on its books the receipts and expenses of that contract and credits no part of the profits of the contract until the contract is wholly completed. But, obviously, rights of others may be involved in a manner to make it a source of concern to them which system is adopted. The choice between the two systems does not appear to be a matter of material concern to the government in collecting income taxes, since a profit earned but not credited at the end of a year must be reported for the subsequent year when the contract is finished, and if reported as part earned at the end of the year the total amount ultimately earned must be reported and accurately adjusted by the subsequent or amended return. All this is specifically provided for in the government income tax regulations.

"But a choice of these two methods of accounting may be a matter of serious concern to an employe of a company who is to receive compensation for his services based upon a percentage of the net profits of the corporation during a definitely specified period, and who is not liable for losses, but merely receives no commissions if net losses result from the operations of the year. Obviously, an employe under a contract of employment from January 1st, 1921, to January 1st, 1922, in which his compensation in addition to his fixed salary, was to be a given percentage of the company's net profits during that period would be entitled to the given percentage of net profits earned by the company during that period. He could not claim the benefits of the entire profits of a contract which had been ninety per cent., finished in the year preceding his contract, nor should he be denied the benefits of his given percentage of the profits which had been earned on a contract which had been ninety per cent., completed during the year of his employment merely because the system of accounting adopted by his employer was to estimate no profits on a contract until it should be wholly completed. In the illustra-

tion here given it seems obvious that in the former assumed case the employe would be entitled to his percentage allowance on but ten per cent. of the profit of the given contract; in the latter assumed case, to his percentage on ninety per cent. of the given contract. For the same reason the company could not as against such an employe properly charge against profits really earned on various contracts in that year losses actually sustained in a preceding year on a contract of the preceding year merely because that contract was in part finished in the year of the employe's engagement.

"The same would be equally true of a contract for three years, extended like the present contract, by agreement, an additional year. If the agreed compensation should be a percentage of the net profits for the entire period it would necessarily include in an accounting all profits made and all losses sustained for that entire period; no more and no less. But the present contract is for a period of years with the following added provision touching the percentage to be paid on the amount of net profits: 'The said net profits are to be *computed* and *accounted for* annually between January 1st and February 15th of each year, beginning with the year 1917.' This stipulation can have but one possible meaning. It means that at the end of each calendar year and before the succeeding February 15th the net profits of the preceding year are to be computed and the employe is to be then paid his percentage on the net profits of such preceding year. Clearly, this could not entitle the employe to any part of the profits actually earned in a year preceding the year of settlement, even though such profits had not been entered on the books until the year covered by the settlement; the same is equally true as to losses of a year preceding the year covered by a settlement, since such losses cannot be made the losses of the year covered by the settlement by merely having them entered on the books in that year. The preceding terms of the contract to the effect that the employer agrees to pay to the employe ten per cent. of the net profits of the business as evidenced by the books of the employer during the period of the agreed employment cannot properly be understood to re-

quire the employe to settle by books that do not disclose or that improperly disclose the profits of a given year for which settlement is to be made. That part of the contract, when considered in connection with the part of the contract immediately following, which clearly stipulates the manner in which each annual settlement shall be made, obligates the employer to keep accurate books from which the annual settlements can be made in the manner specified. It seems clear that it does not justify the employer in charging losses actually made in a year preceding a year covered by an annual settlement against profits actually made in the year covered by such annual settlement. This method of settlement has no attending difficulties. If the profits on a given contract estimated at the end of a calendar year by a percentage that the job has been at that time completed is subsequently found to have been inaccurately estimated the error is easily adjusted. I fully agree with the master in adopting the method of accounting which he enforced. The importance to complainant of this method of accounting lies in the fact that it exempts complainant from sharing the losses of the lean year of 1919. It is not contended that the contract contemplates that complainant shall share in the losses of any year in which the operations of that year result in a net loss to the corporation.

"There are other exceptions which relate to certain specified entries made on the books of defendant as expenses, which several items the master has found to be improper charges against net profits as contemplated by the contract; these must be separately considered.

"Exceptions 1, 2 and 3 are general exceptions to the findings of the master that the net profits for the year 1918 were $139,152.70.

"Exception 4. I think the master was bound to reject the item of $1,577.59 for money drawn out in 1918 by Mr. Kelly, who owned all the stock of the corporation, in the absence of vouchers or adequate explanations as to what the money was used for. The burden to establish these expenditures rests on defendant.

"Exception 5. I am impressed that the master was liberal in the matter of the charge for depreciation for 1918. It may be doubted whether a finding might not have been justified to the effect that an agreement existed that no charge for depreciation should be made. But, if allowed, I think the evidence fully justifies fixing the maximum amount at the amount found by the master.

"Exceptions 6, 7 and 8 arise from the master dividing expense items charge in 1918 and making that portion of the items which was for expenses of a subsequent year a charge as an expense of the subsequent year. This course on the part of the master has already been herein approved. As to the expense item referred to in exception 7 the master cites page 408 of the typewritten testimony in support of his finding. The page cited should have been page 438. There Miss Todd points out that the charge for life insurance on executives made in 1918 was for the years 1918 and 1919. The master accordingly charged one-half to each year.

"Exception 9. I think the master properly charged the cost of the pumps, gas engines and wire cables to equipment account rather than to the specific job.

"Exception 10. I find no error in the master transferring from the hire and equipment account of 1919, $1,017, and adding it to that account in 1918, thus making that account for 1918 disclose the balance of $11,277.77. It seems clear that when defendant hires out equipment for a period in 1918 for $1,017, the revenue belonged to that year and not to the year 1919. See the dates as listed on typed testimony, page 34.

"Exception 11. I think the evidence justifies the finding of the master that $7,823.10, comprising certificate No. 6 of August 12th, 1919, for $3,823.10, and certificate No. 10, of May 12th, 1918, for $4,000, should be credited to 1918 on the Audubon job as determined by the master. This properly reduces the debit balance of the profit and loss account for 118 from $16,637.29, as shown on the books of defendant, to $12,779.26, as shown on the adjusted profit and loss account as the account is restated by the master.

"Exception 12. The items of interest on the Audubon job are of the same nature. That interest, which accrued in 1918, necessarily represents earnings of that year. That interest properly appears in the restated profit and loss account for 1918 of the master as a credit item of $990.

"Exception 13. This is another item of profits earned in 1918 and credited on the books of defendant as profits of 1919.

"Exception 14. This is a similar item. The profits credited on the books of defendant for 1918 were a total of $33,312.61; the master found that $3,654.16 of profits of 1918 were credited in 1919. This made the credit balance of the restated · profit and loss account $36,966.77. In this transfer I think the master was fully justified by the evidence.

"Exception 15. This is another transfer to the year 1918 of profits which were earned in that year and credited in 1919. In this transfer I think the master was correct.

"Exception 16. This is another trnsfer of the same nature.

"Exceptions 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29. These several exceptions are of the same nature and relate to profits which the master found should have been credited in 1918 and were in fact credited in 1919.

"These several exceptions from number 11 to number 29, inclusive, I have not undertaken to here discuss further than the detailed consideration of the propriety of transferring earnings from 1919 to 1918 when the earnings were in fact made in 1918 and not credited on the books until 1919. The master has, however, in his excellent and exhaustive report either discussed each item that is covered by these exceptions here referred to in detail and has given his reasons for his findings or has specifically referred to the pages of the testimony which support his findings. These conclusions of the master I have adopted. Accordingly, the report of the master from page 19 of his typed report, at the caption '1918,' to page 39 of his report, at the caption '1919,' should be read in connection herewith, although some of the findings of the master are not specifically excepted to.

"Exception 30. This exception relates to the year 1920, and excepts to the refusal of the master to allow a credit for money drawn by the president of defendant company. This is the same as a similar exception touching the year 1918, and must be similarly disposed of.

"Exception 31. I think the reduction by the master of depreciation on automobiles from thirty-seven per cent. to twenty-five per cent. is reasonable.

"Exception 32. Since the engineer's report shows that the Cramer Hill sewers job was eighty per cent. completed in the year 1919, that percentage of the loss on the job should have been charged as a 1919 loss and not to the year 1920. See typed testimony, page 59. In so doing I think the master was correct.

"Exception 33. In the Cramer Hill sewer concrete pipe job the master treats the profits of the job, $4,089.10, as made in the year 1920. The books of defendant credit that as a profit of the year 1921. The evidence discloses that although the job was substantially finished in 1920, some work was done in 1921. The total cost of this job appears to have been $13,262.28; of this about $600 appears to have been charged in 1921. This $600 is comprised in part of two payrolls, one of January 7th, 1921, of $211.50; the other of January 14th, 1921, of $149.42; total payrolls in 1921, $360.92. A few other bills are also charged in 1921, making approximately $600. Obviously, this job was substantially completed in 1920, but since a few expense items of 1921 enter into it defendant may appropriately be credited whatever percentage of the total profits of $4,089.10 the 1921 items disclose as the unfinished part of the job. It is not shown that any bills remain uncollected. To entitle defendant to this credit I think the burden should at least be assumed by defendant's counsel to present to me when the decree is signed a percentage calculation disclosing the amount so ascertained; otherwise the master's report will be affirmed as to his finding on that item.

"Exception 34. I think that the percentage of completion adopted by the master in considering this item affords the only practicable equitable method of adjustment, and the resulting adjustments made by him appear to me to be fully justified by the evidence. His reasons as given in his report are approved.

"Exceptions 35, 36, 37, 38 and 39. These several exceptions are general exceptions touching the aggregate amount found by the master to be due to complainant and touching the right of complainant to have the accounts on the books of defendant restated so as to segregate the profits of each year. These features have been already fully considered.

"Exceptions 40, 41 and 42. These relate to a finding of fact made by the master touching $1,200, which was admittedly paid to complainant by defendant. I approve of that part of the master's report, for the reasons stated by the master at length in his report on the pages immediately following his caption of '1918' on page 19 of his typed report.

"Exception 43. This exception is overruled, for the reason stated by the master and already referred to.

"Exception 44. This item is fully considered by the master in that part of his report immediately following the caption '1920' on page 39 of his report. I approve of the findings of the master touching that item, for the reasons stated by the master.

"Exceptions 45 and 46. These are general exceptions to the general result of the master's findings, and are overruled.

"I will advise a decree pursuant to the master's report."

*Messrs. Bleakly, Stockwell & Burling,* for the appellant.

*Messrs. French & Richards,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Leaming.

*For affirmance* — THE CHIEF-JUSTICE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZEN-BACH, HEPPENHEIMER, ACKERSON—10.

*For reversal*—WHITE, VAN BUSKIRK—2.