[Filed November 24, 1890.]

## ALEX. E. McCULSKY v. JOHN KLOSTERMAN.

USAGE—EVIDENCE OF.—Usage may be used as evidence to interpret a contract but not to vary or contradict it. Its purpose is to ascertain the intention of the parties where it cannot be ascertained by the terms of the contract.

CONTRACT—USAGES AS TO THE SUBJECT MATTER.—In all contracts as to the subject matter of which known usages prevail, the parties proceed on the tacit assumption of such usages; but commonly reduce into writing the particulars of their agreement, but omit to specify those known usages which are included as of course by mutual understanding.

NET PROFITS—ASCERTAINMENTS.—Where, in a contract to ascertain the net profits of a firm, it was provided, among other things, that from the outstanding accounts five per cent be deducted to cover losses and bad accounts, and usage was admitted to show in such case that outstanding accounts meant those from which the bad accounts had been segregated and charged to profit and loss, held, no error upon the facts as disclosed by the record.

SUBJECT MATTER—OUTSTANDING ACCOUNTS.—Where the subject matter of a contract is the ascertainment of the net profits of a firm for the purpose of paying in cash the value of a one-third share, the term outstanding accounts, unless it otherwise appear, has a particular meaning, different from the common or ordinary meaning.

Multnomah county: L. B. STEARNS, Judge.

Plaintiff appeals. Affirmed.

This is a suit in equity for an accounting to enforce the rights of the plaintiff under a contract with the defendant, of which the following is a copy:

"This agreement, made and entered into this 6th day of August, 1889, by and between John Klosterman and Alexander E. McCulsky, both of the city of Portland, county of Multnomah and state of Oregon, witnesseth: That whereas said John Klosterman has been and now is doing business at Portland as a wholesale grocer under the firm name of Klosterman & Co.; and whereas the said A. E. McCulsky has been and now is in the employment of the firm of Klosterman & Co., in order to fix the compensation of said A. E. McCulsky it is agreed as follows: The said A. E. McCulsky shall be entitled to and shall receive one-fourth of the net profits of the said firm of Klosterman & Co., commencing with the 19th day of November, 1886, and extending to and including the 19th day of November, 1888, and from the 19th day of November, 1888, up to and including the 19th day of November, 1889, the said A. E. McCulsky shall be entitled to and shall receive a sum equal to one-third of

the net profits of the said firm for the said time last above named. The payments above provided for and the amounts thereof shall be ascertained and made as follows: On the said 19th day of November, 1889, an account of stock shall be taken, and from the amount of the outstanding accounts of the firm there shall be first deducted five per cent thereof to cover losses and bad accounts, and then there shall be paid to the said A. E. McCulsky the share of net profits after said deduction to which he is entitled under this agreement. Such payment shall be made by giving him a credit on the books of said firm, or in cash upon thirty days' notice that cash is demanded. From the sum above provided to be paid to the said A. E. McCulsky, there shall be deducted all moneys drawn by him from said firm during the times hereinbefore mentioned. If, on or before the 19th day of November, 1889, a new agreement is made between John Klosterman and A. E. McCulsky for a further period of service, and A. E. McCulsky allows his share of the net profits to which he is entitled under this agreement to remain in the business, then there shall be no deduction made from the above amount of the outstanding accounts, provided they are collected by the said firm of Klosterman & Co., to cover losses and bad accounts on the day of settlement or the 19th day of November, 1889.

" Witness our hands in duplicate this 9th day of August, 1889.

"John Klosterman,
"A. E. McCulsky.

"Executed in the presence of:
"Norval Fordyce."

The defendant, after making his denials, sets up, among other things, an alleged custom or usage existing among the merchants of the city of Portland with reference to which the said contract was executed, and in contemplation of which the said contract was modified and controlled by said custom or usage to the extent and in the manner therein alleged. During the trial, evidence of such usage or custom was admitted, which the court found to exist, and in view of

which the contract was made and executed, and to the extent and effect specified and alleged, applied it to the contract in its construction, which resulting adversely to the claim of the plaintiff in the accounting, he appeals from the decree rendered therein to this court.

*Williams & Wood*, for Appellant.

Custom or usage will not be admitted to contradict or vary the plain, unambiguous words of a written contract. (Bishop on Con. §§ 449-454; 2 Pars. on Con. 546-547; *Gibney* v. *Curtis*, 61 Md. 192-201; *Ins. Co.* v. *Wright*, 1 Wall. 456; *Marks* v. *Cass County Mill & C. Co.* 43 Iowa, 146; *Bank of Commerce* v. *Bissell*, 72 N. Y. 615; *Holloway* v. *McNear*, 81 Cal. 154; *Partridge* v. *Ins. Co.* 15 Wall. 573; *Collender* v. *Dinsmore*, 55 N. Y. 200, 14 Am. Rep. 224; *Nat. Bank* v. *Burkhardt*, 100 U. S. 686; *Gilbert* v. *McGinnis*, 114 Ill. 28.)

*Stott, Boise & Stott*, for Respondents.

Commercial contracts are entered into with the understanding that the usage of the particular trade or business about which the agreement is made, becomes a part of the contract. (2 Pars. Cont. 536; 1 Addison, Cont. § 244; *Morningstar* v. *Cunningham*, 110 Ind. 328, 11 N. E. Rep. 593; *Dwyer* v. *City of Brenham*, 70 Tex. 30, 7 S. W. Rep. 598; *Parks* v. *O'Connor*, 70 Tex. 377, 8 S. W. Rep. 104; *Long* v. *Davidson*, 7 S. E. Rep. 758.)

Lord, J.—This suit is brought against the defendant partnership by the plaintiff, who was employed by them, but who furnished no part of the capital invested in the business upon the above agreement by which they stipulated that he should receive a sum equal to the one-third of the net profits of the business for the time specified. The controversy between them arises upon the construction to be given to the contract, the counsel for plaintiff claiming that it explains itself and needs no other interpretation, while those for the defendant insist that it was made with reference to a custom or usage, and extrinsic proof of that fact is essential to arrive at the true intention of the parties. The contract provides that the plaintiff shall receive a sum equal to one-

third of the net profits and that the payment shall be ascertained as follows: "On the said 19th day of November, 1889, an account of stock shall be taken, and from the outstanding accounts of the firm there shall be first deducted five per cent thereof to cover losses and bad accounts and then there shall be paid to the said A. E. McCulsky the share of net profits after said deduction to which he is entitled under this agreement." "Net profits" are said to be the gain which accrues on an investment after deducting expenses and losses. "The words 'net profit,'" said Van Fleet, V. C., "define themselves. They mean what shall remain as the clear gains of any business venture, after deducting the capital invested in the business, the expenses incurred in its conduct and the losses sustained in its prosecution." (*Park* v. *Grant L. Works*, 40 N. J. Eq. 121.) With respect to the capital invested and the expenses incurred in the conduct of the business, there is no controversy, and these elements may for the present be eliminated from our consideration. It is the losses sustained in the prosecution of the business to which our consideration is more particularly directed. The point of contention is confined to "bad accounts" as losses, under the contract, and involves an inquiry into net profits as there provided. That point is, that "from the outstanding accounts of the firm there shall first be deducted five per cent thereof to cover losses and bad accounts." Is the intention of the parties so clearly expressed by these words that no extrinsic proof of usage or custom is necessary to explain and ascertain what the parties meant by them? The argument for the plaintiff is, that the language of the contract cited plainly means that five per cent is to be deducted or allowed for bad accounts from the outstanding accounts whether the bad accounts in fact amount to that much or not, and that it was so plainly fixed for the purpose of easily liquidating the amount of bad accounts as losses to be deducted in computing the net profits on account of the relation of the parties and to avoid the controversy which might otherwise arise by charging

bad accounts to profit and loss as is usually the custom.

The argument for the defendant is, that there is an immemorial usage or custom among the merchants of Portland to charge all accounts considered uncollectible or bad accounts to profit and loss, and that such bad or uncollectible accounts are not to be considered or estimated in determining the net profits; that the parties to the contract had full knowledge of such custom and made the contract with reference to it, and that, construing the contract in contemplation of such usage or custom, the provisions of the contract adverted to, only meant or were intended to mean that five per cent should be deducted for bad accounts from the outstanding accounts as remained after the uncollectible or bad accounts had been segregated by charging them to profit and loss. It thus appears that the real question at the bottom of the controversy is, how shall bad accounts to cover losses be deducted under the contract as provided?—from outstanding accounts after uncollectible or bad accounts have been segregated and charged to profit and loss, or from the outstanding accounts including good and bad accounts?

In its general sense, "outstanding accounts" means such accounts as are due, unpaid, uncollectible, as an ordinary outstanding draft or bond or other indebtedness, and is broad enough to include within its terms good and bad accounts which are due and unpaid. In its mercantile sense, when net profits are to be ascertained, it means such accounts as are deemed good and collectible, and from which accounts deemed to be bad and uncollectible have been segregated and charged to profit and loss. If we take the words "outstanding accounts" and apply to them the general sense in construing the contract, it will include good and bad accounts due and unpaid, and from which the five per cent. is to be deducted to cover losses, or to segregate the bad accounts. But if we take the same words and apply to them the mercantile sense in the construction of the contract, it means such "outstanding accounts" as have

had the bad accounts sifted and are supposed to be good, and from which are to be deducted five per cent. to cover losses, which may occur notwithstanding such outstanding accounts are supposed to be collectible.   In ascertaining the net profits of a business, if we take the capital invested, the expenses of running it, and the losses incurred in its prosecution, which last element necessarily includes such accounts as are to be treated as bad and uncollectible, and deduct from the account of stock and the outstanding accounts now freed from bad accounts and treated as outstanding accounts and collectible, the difference will be the net profits.   This calculation proceeds upon the hypothesis that the outstanding accounts are good and the bad accounts have been separated from them and charged to the losses of the business.   But it is common knowledge that it sometimes happens that some of the outstanding accounts turn out to be uncollectible or bad accounts, notwithstanding they have been treated and deemed to be good accounts and collectible.   Was not then the object of the provision of the contract in dispute to cover losses which might arise from outstanding accounts, deemed to be good and charged up as collectible, but some of which might turn out to be bad and uncollectible?   It was to show such was the sense in which outstanding accounts were to be considered when net profits were sought to be ascertained, that proof of usage or custom was resorted to to ascertain the intention of the parties.   This proof, it is insisted, was inadmissible, because it violates the plain terms of the contract; that the provision needs no extrinsic proof to aid its interpretation; and that to allow it was to vary or contradict the plain meaning and effect of this provision of the contract.   As contracts are said to derive their force from the mutual assent of the parties to their terms, it would follow that their operation is to be ascertained from the intention of the parties; and this intention is to be collected from the expressions used by the contracting parties.   When parties so draw their contracts as to leave little if anything to construction,

XX Or.—8.

the legal effect of the agreement must be enforced.  It is when their meaning is not clear or the language is ambiguous that contracts are to be construed in the light of the circumstances surrounding the parties when the contract was made.  (*Wilson* v. *Randall*, 67 N. Y. 338; *Walker* v. *Tucker*, 70 Ill. 527; *Williams* v. *Jones*, 5 B. & C. 108;  *Lowber* v. *Bangs*, 2 Wall. 728.)  Nor can usage or custom be admitted to vary or contradict the express terms of a contract, but it may be admitted to ascertain that which by the contract is left in doubt.  "Usage," said Lord LYNDHURST, "may be admissible to explain what is doubtful, but it is never admitted to contradict what is plain."  (*Blackett* v. *R. Ex. As. Co.* 2 C. & J. 244.)  It may be used as evidence to explain or interpret, but not to vary a contract.  Its purpose is to ascertain the real intention of the parties where it cannot be ascertained by the terms of the contract.  But it cannot be used as evidence to supersede or contradict a positive and definite provision of a contract, because the presence of such a provision in the contract is evidence of the intention of the parties to overrule such usage or custom in conflict with its terms.  "When it is sought," says Mr. Justice MILLER, "to incorporate the custom into an express contract whose terms are reduced to writing and are expressed in language, neither technical nor ambiguous, and therefore needing no such aid in its construction, it amounts to establishing the principle that a custom may add to, or vary or contradict the well-expressed intention of the parties, made in writing." (*Partridge* v. *Ins. Co.* 15 Wall. 573. *Dixon* v. *Dunham*, 14 Ill. 324; *Haskins* v. *Warren*, 115 Mass. 514.)  In a word, a contract which is clear, certain and distinct in its terms is not subject to modification by proof of usage or custom.

These authorities go to the full extent in upholding the principle which is invoked to exclude the proof of usage or custom admitted in the present case.  But none go to the extent of holding, when the meaning of the words is doubtful or ambiguous, or of technical import as applied to the subject matter, that extrinsic proof is not admissible to

ascertain the intent of the parties.  Now by the admitted terms of the contract, the plaintiff was to receive a sum in payment equal to one-third of the net profits of the firm. It was a mercantile contract, and its subject matter was the ascertainment of the net profits of the firm.  The contract says it was to "be made and ascertained as follows:  On the said 19th day of November, 1889, an account of stock shall be taken and from the outstanding accounts of the firm there shall be first deducted five per cent to cover losses and bad accounts, and then there shall be paid to the said McCulsky his share of the net profits," etc.  For the purpose of ascertaining the net profits of the firm, and paying to the plaintiff a sum equal to his share, the contract provides the method in which it shall be ascertained and made, and yet it is too plain for argument that the taking of account of the stock and deducting five per cent from the outstanding accounts to cover losses and bad accounts would not determine the net profits.  There are other elements omitted and which must be included in the calculation to ascertain the net profits, however outstanding accounts may be considered.

Upon the method provided by the contract net profits cannot be ascertained, or his share of them computed for payment.  It is true that there is no controversy between the parties in respect to them, and it is admitted "that running expenses were, of course, to be deducted before there could be any net profits," which shows quite plainly that the method provided to ascertain the net profits by the contract was imperfect and not capable of accomplishing the object sought to be attained by it.  The contract also provides that an account of stock shall be taken, but what object can be served by this when the five per cent deduction further provided from outstanding accounts, in whatever way construed, will not ascertain the net profits.  To say that this provision was only intended to ascertain the item of bad accounts, as an element in determining net profits, is to ignore this part of it; or to include it, the omitted matter must be supplied in the calculation, which not only exposes

that the mode of ascertaining the net profits as provided is insufficient for that purpose, but tends strongly to indicate if what is omitted shall be supplied, that the basis of such calculation will include outstanding accounts freed from bad accounts, subject to a deduction of five per cent to cover losses arising from them or as a protection against such liability, for the reason that the share of the net profits to which the plaintiff was entitled was to be paid in cash. But eliminating these matters, and confining ourselves exclusively to the matter of the deduction of five per cent to cover bad accounts, do not the words " outstanding accounts," in a mercantile contract, when net profits are to be ascertained, have a technical or particular meaning different from their ordinary or general meaning when used without reference to net profits, or a calculation to ascertain net profits? The admission of the proof of usage was for this purpose, and. the objection raised to its admissibility is, not that the words may not have such particular meaning when net profits are to be determined, but that the parties have superseded this meaning by a plain and explicit statement, that from the outstanding accounts five per cent is to be deducted for bad accounts, which indicates clearly that it was the intention of the parties to overrule such usage in conflict with its terms. That it was plainly intended, as counsel say in their brief, that instead of charging bad accounts to profit and loss, that is, instead of segregating the bad accounts bodily, five per cent of all accounts, good or bad, should be deducted to cover bad accounts and losses that otherwise would be written up as profit and loss. This agreement plainly admits, was it not for the plain and unambiguous meaning of the provision as claimed, that bad accounts otherwise would be written up to profit and loss— in a word, that the provision is so explicit as to supersede the meaning that would otherwise be given to it, and evinces an intention to repudiate any meaning derived from usage or custom in conflict with it. Hence, the proof of

usage to aid in the interpretation of the provision was inadmissible.

Now this agreement admits that outstanding accounts, when net profits are to be ascertained, are freed from bad accounts by charging them to profit and loss except for such definite meaning as is insisted supersedes it; but it recognizes at the same time that there is a particular meaning attached to these words, or that they do have a commercial signification, different from the sense in which they are employed when outstanding accounts are referred to generally, which may include good or bad accounts. But how is this definite and settled meaning ascertained by which the mercantile sense of these words are overthrown or precluded from being shown? Simply by resorting to the dictionary and defining the word outstanding in this wise: "Outstanding: To stand or remain beyond the proper time; hence, to be unpaid, as a debt, and the like." "The whole amount of the revenues * * * as well *outstanding* as collected." "To remain uncollected, unpaid, as outstanding contracts." Hence, all accounts uncollected are outstanding accounts, and include both bad and good accounts. But this is only defining the word in its general sense, without reference to a particular sense with which it may be clothed when used in mercantile contracts to determine net profits. That in their general sense, outstanding accounts mean unpaid accounts, and may include good and bad accounts, is not questioned and has already been admitted. This is their common meaning. But we are called upon to interpret these words in a contract where they may have a technical meaning which may modify that meaning. What is there in these words or the provisions that fixes and settles the general sense as the proper one to be applied to them to the exclusion of the technical sense sought to be applied in the interpretation of the contract? The contract is a mercantile one, and the subject matter to which the words are to be applied is the ascertainment of the net profits of a firm. In such case it can hardly be disputed that they have a meaning

different from their common meaning unless the intention
is plainly to exclude it.   What word or phrase is there to
show such intention or give it that effect?   The whole argu-
ment is based upon treating the words in their general sense
when the nature of the contract, its subject matter, and the
usage of trade show that they have an accepted signification
different from their common meaning.

"What words," as Mr. LAWSON says, "are more plain and
unambiguous on their face than such words as a thousand,
a week, a day?   Yet we shall see a thousand has been held
to mean twelve hundred; a week, only during a portion of
the year; a day, only a working day." (Lawson on Custom
and Usage, 368.)   And again he says:   "In all contracts as
to the subject matter of which known usages prevail, parties
are found to proceed on the tacit assumption of these usages.
They commonly reduce into writing the special particulars
of their agreement but omit to specify those known usages
which are included however, as of course, by mutual under-
standing."    In what respect are the words "outstanding
accounts" plainer, of more positive signification, than "a
thousand," or "a week," or the innumerable instances which
must be referred to, and are cited in the excellent work just
referred to?   The case cited and relied upon is not in conflict
with the principle of the admission of such testimony.   "The
written agreement in that case," BILLINGS, J., said, "used a
term working day, which is unambiguous and which had
an accepted signification, both in commercial and judicial
language"; and to allow "proof of usage to be introduced to
show what the very respect in which this term had its origin
and a world-wide employment, has a local meaning repug-
nant to its settled sense," would, as the learned judge said,
"certainly introduce ambiguity where none exists and
defeat the clearly expressed intent of a written agreement."
(*Pederson* v. *Eugster*, 14 Fed. R. 422.)   In that case the
meaning of the term was sought to be dwarfed from its
accepted signification, alike in commerce and law. contrary
to its settled sense—a sense that could only be overcome by

positive and definite language in the contract overruling it.
No such settled sense alike attends the use of the words
"outstanding accounts" without regard to the circumstances
of its employment.   They have a definite signification when
employed to ascertain net profits by the usages of trade,
unless the meaning is otherwise expressly intended, and the
argument admits it.   In such case when the contract involves
their employment for the purpose of computing net profits,
the tacit assumption is that they were used in the sense of
such usage, unless there is something to conflict with it.   In
the case at bar the object of the proof was to show how
"outstanding accounts" were understood and treated, when
net profits were computed, and that they had by the usage
of trade a signification different than when otherwise
employed, or generally.   (*Myers* v. *Sarl,* 107 E. C. L. R.
306.)   If we allow this proof and give to these words this
sense, then the five per cent is to be deducted from the out-
standing accounts deemed to have been winnowed of its bad
accounts.   But it is common knowledge that outstanding
accounts considered and treated as collectible often fail to
realize the cash amount which they represent despite the
utmost vigilance.   All such calculations are based upon an
approximation to the actual collectibility of such accounts,
but it is every-day knowledge that such calculations are
liable to disappoint our expectations, despite our utmost cir-
cumspection, and in the face of our best considered judg-
ments.   Bearing in mind that when the net profits are ascer-
tained the plaintiff is to receive a sum in cash payment
equal to the one-third value of such net profits, and it is not
difficult to understand why the defendant should require
and the plaintiff be willing to contract to give five per cent
deduction from such outstanding accounts.   The basis is a
cash valuation, and it is hardly probable that the accounts
would realize more after such deduction of five per cent.   The
truth is, there are few merchants, whether wholesale or retail,
who, after they have sifted their accounts of all indebtedness
deemed non-collectible, would not readily take a reduction

of five per cent for the cash in preference to running the risk of their collectibility.

It results that there was no error and that the decree must be affirmed.