CRAWFORD *v.* CALKINS.

1. CONTRACTS—INTERPRETATION — PROFIT SHARING AGREEMENT — PARTNERSHIP.

Under the provisions of a contract to manage the business of defendants for one-third of the net profits and for actual expenses in addition thereto, said manager not to be a partner nor to be liable for losses sustained in the business, which con-sisted of buying and selling horses, payment therefor being

received in notes that ran from one to three years and were negotiated generally before maturity, an action would not lie on the contract for the manager's commissions until all outstanding notes were paid and the net profits became certain.

2. SAME—WORDS AND PHRASES—NET PROFITS.
   Net profits are what remain as a clear gain in any business venture after deducting the capital invested in the business and the losses and expenses incurred in its conduct.

3. SAME—LOSSES.
   The term losses includes such accounts as are to be treated as bad and uncollectible, and the clause exempting him from liability for losses or any portion thereof did not authorize him or his assignee in claiming only profits undiminished by failure to collect accounts or by other losses.

Error to Shiawassee; Miner, J. Submitted April 11, 1912. (Docket No. 5.) Decided May 31, 1912.

Assumpsit by Mamie E. Crawford, assignee of John Crawford, against Beattie W. Calkins and another for commissions due for services performed by plaintiff's assignor. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*Bernard B. Selling* and *John T. McCurdy*, for appellant.

*Odell Chapman, William M. Kilpatrick*, and *F. J. Northway*, for appellees.

BROOKE, J. This action is brought by plaintiff as assignee of her husband for an alleged breach of the following contract:

"BYRON, MICH., Oct. 26, 1907.

"Whereas B. W. Calkins, of Venice township, and E. F. Augsbury, of the same place, have agreed to enter into the business of importing and selling high-class stallions, but said parties not being familiar with said business, therefore, they have this day hired John Crawford, of Byron, Michigan, to act as general manager in buying and selling said horses (the financial end of said business

to be looked after and controlled by said Calkins and Augsbury). It is mutually agreed that said Calkins and Augsbury are to furnish all money necessary to properly conduct said business, and at proper times and seasons, and to render such aid and help in buying and selling said horses as said Crawford may request; and the said Crawford is to devote such personal time and attention to the purchase and sale of said horses as good business requires, and in consideration of said Crawford's services, and expense to be rendered to said Calkins & Augsbury, it is mutually agreed that said Crawford shall receive as pay for his time, service and expense in buying and selling horses for them: *First.* All of his actual expenses in and about carrying this agreement into effect and about his work hereinunder. *Second.* He is to receive the sum of $33\frac{1}{3}$ per cent. of all net profits derived from the sale of such horses, and jacks or other animals hereinunder. It is mutually agreed that this contract shall be and remain in full force and effect as long as all parties are satisfied; but, in case dissatisfaction arises, then all questions shall be settled by arbitration; but said Crawford shall not be deprived of the amount of his commission that he might be entitled to under this contract on all unsold horses, jacks or other animals on hand; and when his commissions are paid and adjusted then all of said horses, jacks and personal property to be and belong to said Calkins & Augsbury, released of and from all claims of said Crawford for commissions. If there are any losses sustained in carrying on this business, the said Crawford shall not be liable for any part or portion thereof, as said Crawford is not a partner nor interested in said business except as herein provided. The said Crawford is to furnish to Calkins & Augsbury each and every 30 days statements in writing of his expenses under this contract; and it is mutually agreed that all books, accounts and statements of and concerning the business to be carried on under this contract shall be properly kept and open at all times to inspection by each of the parties hereto; and it is mutually agreed that said books and accounts shall all be kept at Byron, Michigan, and in case of dispute or dissatisfaction said books and accounts shall be delivered to the arbitrators. All expenses incurred in and about carrying into effect this contract and agreement by any and all persons shall be delivered to the bookkeeper at Byron, Michigan, once in each and every thirty days.

All settlements and balances to be paid to Crawford or his assigns, each and every quarter after date thereof.

"Witness our hands and seals this 26th day of October, A. D. 1907.

[Signed]          "B. W. CALKINS.          [L. S.]

"E. F. AUGSBURY.          [L. S.]

"JOHN CRAWFORD."          [L. S.]

Under this contract, plaintiff's assignor immediately entered upon his employment and continued thereunder for approximately three years. The ordinary method of doing business was to sell a horse to a number of individuals or stock companies for a stated sum, taking therefor from the purchasers three promissory notes, payable one, two, and three years after date, with interest. These notes were sometimes, perhaps usually, sold or discounted in the vicinity where their makers resided. The notes were all made payable to the order of Calkins & Augsbury, and such of them as were sold were indorsed by them or by John Crawford, acting for them under a power of attorney. From $50,000 to $70,000 of this paper was discounted by Crawford personally, under instructions from Calkins & Augsbury to secure the best terms possible.

It is conceded that, at the time of the trial, notes amounting to $79,284.66 were still outstanding, and that if plaintiff was not entitled to one-third of that amount until the notes were paid, she would have no claim which could be reduced to a judgment at the present time. Plaintiff's claim is stated by her counsel as follows:

"Our contention is that the moment Calkins & Augsbury took a note bearing the legal rate of interest, 6 or 7 per cent. as the case may be, on a horse, that that closed the transaction as far as Mr. Crawford or Mrs. Crawford are concerned, and that from that moment he was entitled to his one-third, the same to be paid to him at the end of the quarter in which that transaction occurred, which your honor, I understand, holds is not the law and gives us an exception. I have stated it fairly, have I not?

"*The Court:* That is correct.

"We therefore offer proof on our theory to this effect: That we will show what each horse cost up to the moment

of the sale and up to the time that that horse was sold and a note or notes were received for it, and we will show the difference between the face of those notes and the cost of that horse, and we will contend that that is the net profit of the horse at present due to John Crawford or due at the end of the quarter in which that transaction occurred, and that, I understand your honor holds, is not the law, and gives us an exception to it."

The court below held that plaintiff was not entitled to recover at this time, being of the opinion that "net profits" could be ascertained only after the notes were paid and capital, expenses, and losses deducted. We are of opinion that this conclusion is correct.

The term "net profits" has been defined to be—

"What shall remain, as the clear gain of any business venture, after deducting the capital invested in the business, the expenses incurred in its conduct, and the losses sustained in its prosecution." *Park* v. *Locomotive Works*, 40 N. J. Eq. 114 (3 Atl. 162).

See, also, 29 Cyc. p. 672, and cases cited. *Morrow* v. *Murphy*, 120 Mich. 204 (79 N. W. 193, 80 N. W. 255).

In order to ascertain the net profits, losses must be deducted. Losses include necessarily such accounts as are to be treated as bad and uncollectible. *McCulsky* v. *Klosterman*, 20 Or. 108 (25 Pac. 366, 10 L. R. A. 785). It is contended by plaintiff that the clause in the contract, "If there are any losses sustained in carrying on this business the said Crawford shall not be liable for any part or portion thereof"— relieves plaintiff from any losses which may arise through the failure to collect any of the outstanding notes. We cannot agree with this construction of the contract. The agreement must be construed as a whole.

The second clause provides that Crawford shall receive $33\frac{1}{3}$ per cent. of all net profits derived from the sale of horses, etc. This clause is entirely inconsistent with the construction proposed by plaintiff. A perusal of the whole contract convinces us that, if, in the conduct of the business as an entirety, a loss instead of a profit were

shown, plaintiff's assignor should not be called upon to bear any portion thereof, but so long as losses may be taken care of by profits, they must be borne by the parties jointly interested in the venture in order that the net profits may be ascertained.

This conclusion disposes of all that was determined in the court below. Plaintiff claims that, inasmuch as defendants agreed to furnish all money necessary to conduct the business, they should not be permitted to charge against the account, either as an expense or a loss, the sums represented by the discount allowed upon the sale of the notes. As this question was not passed upon by the court below, we decline at this time to consider it.

The judgment is affirmed.

MOORE, C. J., and STEERE, McALVAY, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.