[Civ. No. 6009. First Appellate District, Division One.—November 16, 1927.]

WILLIAM J. BORADORI, Appellant, v. FRANK B. PETERSON, etc., Respondent.

754

William P. Caubu and Robert L. McWilliams for Appellant.

Francis V. Keesling and L. L. James for Respondent.

CAMPBELL, J., *pro tem.*—This action was brought by appellant against respondent, by whom he was employed for a number of years, to obtain a decree directing the payment of such sum as might be found to be owing to him. As stated by appellant in his opening brief, the case involves two principal questions. The first is whether or not appellant is entitled to share in the profits accruing from subletting certain premises in which respondent's grocery business had been located; the second whether or not appellant is entitled to a reasonable compensation for services rendered by him following the termination of his employment by respondent. Judgment was entered in favor of respondent—defendant in the court below—and from such judgment and the order denying his motion for a new trial this appeal has been taken.

Respondent Frank B. Peterson was for many years engaged in the wholesale grocery business in Main Street, San Francisco, and for a number of years appellant had charge of the business so far as the buying and selling of the merchandise and the direction and control of the salesmen were concerned.

The precise terms of appellant's employment at the outset do not appear. It is in evidence, however, as testified by respondent Frank B. Peterson, that he, being the owner of the business, charged the business six per cent for the moneys invested by him and that the profits of the business so far as his associates were concerned, were computed after the deduction of that six per cent. While the firm was in business at the Main Street location it occupied leased premises, the lease on which had been purchased by Peterson. This lease was taken in the name of Frank B. Peterson personally and was regarded and treated as his personal affair. The grocery business was charged $245 per month rent, and the lease, while handled in the firm's books, was handled in an account called "lease account." At the end of the year this account was closed out directly to Frank B. Peterson's investment account, which was a holding capital account and did not affect the business. There were two other tenants in the premises—the Naknek Packing Company and the Velvetone Company, who paid rent, which rent went directly to Frank B. Peterson's personal account.

In December, 1913, appellant Boradori had planned to leave Peterson and to associate himself with the William Cluff Company. When this was called to the attention of Peterson he persuaded Boradori to abandon that plan and remain with him, and be agreed to give Boradori thereafter one-fourth of the net profits of the business. This understanding was embodied in a written memorandum reading as follows:

"San Francisco, December 8, 1913.

"This is to confirm verbal agreement whereby Mr. William J. Boradori is to receive $200.00 per month from Dec. 1st, 1913, from Frank B. Peterson Co. and one-quarter of the net profits, commencing Feb. 1, 1924, for at least one year.

"(Signed) Frank B. Peterson."

The first of the two questions involved in this appeal is the meaning of the term "net profits" as used in this written memorandum of agreement.

This agreement was continued in force until the sale of the business in 1919. During the intervening years Bora-

dori was paid various sums as his share of the profits. Some years there were no profits, and Boradori's income was limited to his salary. One year his profits went up to $10,000 or $12,000.

The question as to the construction to be placed on the agreement arises out of the circumstances surrounding the removal of the business from Main Street to new quarters at Spear and Harrison Streets. In the month of December, 1918, Peterson, casting about for a new location, rented from J. D. and A. B. Spreckels Securities Company a building on the corner of Spear and Harrison Streets for a period of ten years and to that location moved his grocery business. The removal was made with the consent of appellant and no change was made in the business and relations existing by virtue of the arrangement of employment made in 1913.

When Peterson commenced business at the Main Street location there was a ground lease of the premises which had some years to run. The lessees had erected the building, which upon the termination of the lease was to become the property of the owner. Peterson himself paid the lessees a monthly rental. The building being in bad condition, Peterson threatened to leave unless substantial repairs were made. The landlord thereupon sold the lease to Peterson, who paid $6,000 for the remainder of the term. This he spread over a number of years, charging the grocery business with $245 rent per month and crediting his personal account with that amount. He also charged other lines of business in which he was interested with their proportionate shares. All of these matters were carried on the books of Frank B. Peterson Company under what was termed "lease account" and were never considered by anyone to be a part of the grocery business. When Frank B. Peterson Company moved to the new quarters in 1918 the same method of handling the lease account followed except that for some unexplained reason the term "rent account" was used instead of "lease account," and thereafter under the Spreckels lease the grocery business was charged with the rent and credited with the rent received from the subtenants.

In 1919 Peterson concluded to dispose of his grocery business and found a purchaser in Getz Bros. & Company,

who were willing to sublease the Spreckels premises from Peterson for the remainder of the term and pay Peterson a certain sum over and above that called for in the lease. Before consummating the transaction Peterson placed the matter before appellant and stated to him in effect that unless it met with his approval he would proceed no further, and appellant agreeing, the sale was consummated. As to the lease, appellant testified: "Q. What was said about the lease? A. Mr. Peterson told me what he was asking for the lease and it was—and we understood them—we figured it was between fifty and fifty-five thousand dollars." There is, however, no testimony that appellant was to receive any of the profit made on the lease nor that he demanded any or even suggested that he was interested in it.

The judgment is attacked upon the ground of the insufficiency of the evidence to justify the finding that the plaintiff received everything he was entitled to receive; that he had no interest in the lease and therefore none in the profit derived from the sublease to Getz Bros. & Company.

Under the written agreement of 1913 appellant was to receive twenty-five per cent of the net profits of the grocery business. Parol evidence was admitted to show the intention of the parties as disclosed by their own construction of the agreement, the circumstances under which it was made, and their previous, contemporary, and subsequent business relations. Appellant did not contend that any partnership relation existed between the parties. There is no question but that appellant was at the time the agreement was made an employee of Peterson in the grocery business alone as manager of that business. The execution of the agreement made no change in their relationship of master and servant. Appellant acquired no interest in Peterson's other business affairs. When the grocery business showed a profit he received his share of it; when it showed a loss Peterson sustained the loss, appellant at all times receiving his regular salary. The agreement was made December 8, 1913, and appellant was to receive "one-quarter of the net profits commencing February 1, 1914, for a least one year." It therefore appears that at the expiration of one year either party could terminate the agreement at will, and that if appellant was dissatisfied with the increased

rent under the Spreckels lease or the fact that the entire rent was charged to the grocery business and credited with rent received from the subtenants, as he claims, he could have refused longer to remain in the employ of Peterson. He certainly cannot complain of the fact that after the removal to the new location the grocery business, from the net profits of which he received a part, was credited with the rent paid by the subtenants, while in the old location the rent paid by the subtenants went to Frank B. Peterson personally, and no part thereof inured to his benefit.

Appellant contends that the conduct of the parties shows that the profit on the lease was intended to be figured in determining the net profits of the business, specifying the particular circumstances to show such intent as follows: That at the time of the execution of the Spreckels lease Peterson said to appellant Boradori: "I am signing my life away and it is up to you to make good on this lease"; that it appeared from the books of the grocery business after the removal to the new premises that Naknek Packing Company and Red Salmon Company, who were subtenants, paid a monthly rental each of $100 for the use of the premises occupied, which amounts were charged to profit and loss on the books of the Peterson Company in connection with the grocery business; that the accounting had after the sale of the business showed that under the heading "rent account" there were credited receipts of rent paid by the two subtenants in the sum of $600 as against rent paid out on the principal lease in the sum of $2,787.82; that in the statement of accounts prepared by the expert accountant in August, 1919, for the purpose of closing out the business an item of $7,626.50 appears as a debit item for rent paid by the Peterson Company under the Spreckels lease; likewise an item appears of $2,084.87 representing the rents received from the subtenants; that when Peterson was about to make the deal with Getz Bros. he showed a memorandum to appellant and said: "This deal, William, I want you to understand is up to you—dependent upon your yes or no. Study it over"; that Peterson told appellant he was asking for the lease between fifty and fifty-five thousand dollars.

Appellant does not contend that there was any express agreement that the lease should be deemed a part of the

grocery business, but relies upon what he terms "acquiescence."

The following colloquy between the court and Boradori shows the unimportance of the statement testified to by appellant as having been made by Peterson: "The Court: Q. You said Mr. Peterson said to you, 'You must make good on this lease,' and Mr. James said, 'Didn't he say you must make good on this business?' A. The lease was a part of the business. Q. Well, as contradistinguished from the business, is there such a thing as making good on the lease? A. Mr. James was differentiating. Q. As I understood it—as I understood, Mr. James said to you 'You must make good in the business,' and you answered, 'No, he said "You must make good on the lease" '—what is the difference between making good on the lease or in the business? A. Well, there wouldn't be any difference but he referred to the lease." With reference to the same matter Mr. Peterson testified: "Q. What did you say— first, when you moved down to the new place, you expanded the business did you not? A. Yes. Q. A greater expense and a greater overhead? A. With the prospects for a much larger business. Q. And the rental was thirteen hundred dollars a month? A. Nearly thirteen hundred. · The Court: Q. What did you say to Mr. Boradori? A. Something like this: I said: 'That is a frightful rent to pay; you will have to work pretty hard.' Mr. James: Q. Did you say he had to work hard on the business? A. Well, he had to manage the business well, something like that."

It is evident that Peterson had some misgivings as to whether the business in the new location would increase in sufficient proportion to carry the additional rent and therefore he wished to impress upon appellant the necessity for his own sake as well as for the interest of the business that he "make good on the lease" as stated by appellant, or as testified by Peterson, "he had to work pretty hard—had to manage the business well."

The meaning of "net profits of a business" has been defined by the courts, if authority is necessary to define a meaning so generally and commonly understood. "The words 'net profits' define themselves. They mean what shall remain as the clear gains of any business venture after the expenses incurred in its conduct and the

losses sustained in its prosecution (*Park* v. *Grant Locomotive Works*, 40 N. J. Eq. 114 [3 Atl. 162]; *Crawford* v. *Calkins*, 170 Mich. 587 [136 N. W. 369])."

Therefore, inasmuch as the net profits of a business, which consists of the buying and selling of merchandise, is limited to the difference between the gross receipts for sale of merchandise and the expense of conducting the business, of which rent is probably the most essential item, it is incumbent upon appellant to show some agreement between the parties that the rent or lease should be treated as merchandise in determining whether the business resulted in a profit in which appellant is entitled to share.

No authority directly in point has been cited by counsel for either side, due probably to the fact that none could be found, as it is not likely that the contention here made has been urged with any degree of frequency.

The case of *Amsden* v. *Dunham*, 78 App. Div. 33 [78 N. Y. Supp. 989], is more nearly analogous to the circumstances here presented than any of the cases cited. There the defendant was engaged in the business of buying and selling cheese. Plaintiff was employed at a fixed salary and a commission of five per cent upon the net profits of the firm. While plaintiff was working under this agreement defendants constructed a warehouse, which on dissolution of the firm and while plaintiff was still in their employ they sold at a profit of $6,000. Plaintiff claimed he was entitled to share in this profit. The court says: "We do not think it was fairly within the contemplation of the parties that a profit or increase in valuation of such a piece of property as this should be the basis of commissions to plaintiff. The regular legitimate business of defendants when plaintiff entered their employ was, as stated, the purchase and sale of cheese. It is manifest that he was hired to help about that business. While one of the expressions above quoted from the evidence about his receiving commissions is quite broad, his complaint alleges his right to recover for work, labor and services performed for defendants 'in their partnership business' and which was the buying and selling of cheese. So far as the evidence and surrounding facts disclose, that was the purpose for which he was hired. It does not appear that he was expected to render any particular service with ref-

erence to such ventures as the erection and operation of this warehouse, and it is a reasonable construction of the contract that he should receive commissions upon the profits of the business which received the benefit of his service. While it is true that this warehouse was deemed advantageous for the proper conduct thereof, it can hardly be regarded as strictly and properly a part of the business itself. It was simply a means of carrying on the work in which the copartnership was engaged. It was collateral and incidental to the same rather than a part thereof. It would be unreasonable to assume that the parties contemplated that any enterprise in which the copartners might engage, although with copartnership funds and however remote from their natural business, should be made the basis of swelling or reducing plaintiff's commissions. We assume that if defendants had made profits in any one year in the purchase and sale of cheese, upon which plaintiff was entitled to commissions, and such profits were entirely wiped out by some outside venture like the erection of this building, or the purchase of land or any other form of speculation, plaintiff very strenuously would have insisted that he should not be affected by such losses. The reverse of the illustration seems to us proper. We do not think that the erection of the building was a part of the copartnership business which plaintiff was hired to work in, and that he is therefore not entitled to compensation by way of commissions upon any apparent profit in the building.'' (See, also, *Hawley* v. *Coal Co.*, 48 Kan. 593 [30 Pac. 14].)

Appellant has cited several authorities to the effect that when the meaning of the nature of a contract is considered doubtful, the acts of the parties done under it affords one of the most reliable clues to the intention of the parties: that the contemporaneous and practical construction of a contract by the parties is strong evidence as to its meaning, if its terms are equivocal. We are in perfect accord with the principles enunciated in those authorities, but are not of the opinion that the acts of the parties done under the contract here show that the profit, if any, to be made on subleasing the premises on the sale of the business was to be accounted for as a profit of the grocery business. We are unable to find any evidence in the record that suggests a meeting of the minds of Peterson

and Boradori upon the inclusion of the lease as a part of the grocery business, or that it entered Boradori's mind until some time after the sale of the business.

■ With reference to the second cause of action in which appellant alleges that he is entitled to a reasonable compensation for services rendered to Frank B. Peterson following the termination of his employment in the grocery business and respecting which the court found he was not entitled to recover such compensation, it may be said that there is sufficient evidence in the record to sustain the finding of the trial court. According to the testimony of appellant he worked for Mr. Getz for one month following the sale of the business, and then was at Peterson's office nearly every day for about ten or eleven days. On October 12, 1919, he left for the east on business of his own, returning in about six weeks. He opened a brokerage office of his own at Peterson's for which office Peterson did not charge him any rent. He spent about half of his time in December, 1919, and January, and February, 1920, at Getz Bros., adjusting differences that had arisen in the price of merchandise and other matters connected with the transfer of the business. In March, 1920, he had another contract with Mr. Peterson on another matter which had no bearing on the matter in controversy, for which service he received $3,000. Frank B. Peterson testified that he did not employ appellant at all after the sale to Getz Bros., except when he was buying groceries for the canneries, for which he was paid very handsomely. Otherwise there was no employment whatever. Appellant occupied office space with him, for which appellant was not charged rent and he helped to establish appellant in the brokerage business. During the period of nine months subsequent to September 1, 1919, appellant never requested or demanded of him that he pay him anything.

From what has been said it follows that in our opinion the findings complained of find ample support in the evidence.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.