65 N.J. Super. 341 (1961)
167 A.2d 807
RAY SMITH, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
PENINSULA HOUSE, INC., A BODY CORPORATE OF THE STATE OF NEW YORK, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 6, 1961.
Decided February 10, 1961.
*342 Before Judges GOLDMANN, FOLEY and HALPERN.
Mr. John Warren, Jr. argued the cause for appellant and cross-respondent (Messrs. Parsons, Labrecque, Canzona & Blair, attorneys).
Mr. George W. Wolin argued the cause for respondent and cross-appellant.
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff brought an action seeking specific performance of a contract for the sale of real *343 estate based on his acceptance of an option contained in his employment agreement with defendant. He also sought an accounting with respect to his share of defendant's net profits under the employment agreement. The trial court held that plaintiff had not exercised his option within the ten-day period prescribed by the employment agreement, finding that notice of the proposed sale of the premises had been communicated to plaintiff on December 20, 1958 (not on December 22, as plaintiff claimed), and the option had not been exercised until December 31, 1958. Furthermore, the court determined that defendant's net profits for 1958 amounted to $7,460.54, and therefore entered judgment for plaintiff in half this amount, as provided by the agreement. The court made no finding with respect to defendant's contention that plaintiff had either waived or repudiated his rights under the option contract, and was estopped from asserting them.
Plaintiff appeals, contending that the factual finding of the trial judge that notice of the proposed sale of the premises had been communicated to him on December 20 and not December 22, 1958, is not supported by the evidence, and that he had not repudiated the option contract or waived any rights thereunder. Defendant has taken a cross-appeal from so much of the judgment as awarded plaintiff $3,730.27, half of the total net profits, contending that under the employment agreement the firm of auditors therein mentioned found there was no net profit for the purposes of the profit-sharing provision of the agreement.

I.
In March 1958 the parties entered into an employment agreement whereby defendant agreed to employ plaintiff as manager of its Peninsula House, Sea Bright, N.J., a hotel with restaurant, bar and bathing facilities. Among other things, the agreement provided that defendant was free at any time to sell or lease its property. If, during the course *344 of plaintiff's employment, the property was sold for more than $190,000 plus the aggregate amount of unamortized capital expenditures made by the corporation subsequent to the date of the agreement, plaintiff was to receive an amount equal to half the excess, as and when received by defendant. If, however, the amount offered was less than $190,000, plaintiff was given the option of purchasing the property upon the same terms as those offered, "for a period of ten days after notice to you of such proposed sale * * *."
Defendant received an offer of $135,000 cash for the Peninsula House property. On December 19, 1958 defendant's president communicated this offer to plaintiff by telephone and read to him a letter, dated and mailed that day, notifying him of the offer so that he might exercise the option given him under his employment agreement, and calling his attention to the fact that if he did not agree to accept the same terms as those offered "within ten days after receipt of this notice," defendant would assume that it was free to enter into the proposed contract of sale. As noted, the trial judge found that plaintiff received the letter the next day, December 20. Plaintiff concedes that if this finding is sustained, his acceptance on December 31 was not a proper exercise of his option.
It would appear that the oral communication of the offer was notice enough in itself. The notice contained in the letter of December 19, 1958, giving plaintiff ten days after "receipt of this notice" to accept, was without consideration. However, the parties have chosen to deal with the matter on the basis of the letter alone, defendant contending that the trial judge's finding was entirely correct, and plaintiff claiming that the proofs do not sustain it.
The issue on the specific performance aspect of the action was entirely factual, and involved exclusively a determination of the credibility of the parties and their witnesses. On a review of any civil cause involving issues of fact not determined by the verdict of a jury, as here, we are authorized to make new or amended findings of fact. However, *345 due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses. R.R. 1:5-4(b); Capone v. Norton, 11 N.J. Super. 189, 193 (App. Div. 1951), affirmed 8 N.J. 54 (1951); Abeles v. Adams Engineering Co., Inc., 64 N.J. Super. 167, 183 (App. Div. 1960).
Our study of the record convinces us that there is no reason to disturb the finding below. It is clear that the trial judge was more impressed with the testimony of defendant's president than that of plaintiff and his secretary. There is substantial evidence to support his conclusion that the option was not timely exercised. Accordingly, we affirm so much of the judgment as denied plaintiff specific performance.

II.
With respect to the cross-appeal, we conclude that the $3,730.27 awarded plaintiff on his demand for an accounting, and purportedly representing his half-share of defendant's net profits, must be reversed.
The provision of the March 1958 employment agreement under which plaintiff claims one-half of the net profits reads:
"2. As full compensation for your services, you are to receive one-half of any net profit (before income taxes) earned by the corporation during each calendar year of your employment, as determined by the corporation's independent auditors (presently Harris, Kerr, Forster & Co.), whose determination of net profit shall be conclusive."
The auditing firm's statement of profit and loss for the year 1958 showed that the hotel operation had resulted in a net loss of $6,120.22; there had been an $11,591.91 profit realized from the sale of the so-called Elliott property owned by the defendant, and the net profit for the year was therefore $5,471.69. The trial judge used this last figure and increased it by $1,988.85, representing accountants' fees for services in 1957 but charged to the corporation's expenses in 1958. In this fashion he arrived at $7,460.54, half of which he gave plaintiff as his share of the net profits for 1958.
*346 The meaning of the term "net profit" is not fixed and invariable, but depends upon the setting in which it is used. See, generally, Note, 51 Colum. L. Rev. 867 (1951); Washington, "The Corporation Executive and His Profit-Sharing Contract," 50 Yale L.J. 35 (1941); Annotation, "Construction of `net profits,' `earnings,' or the like, in provision for profit-sharing bonus for corporate officers or employees," 49 A.L.R.2d 1129 (1956). The trial court obviously believed that Harris, Kerr, Forster & Co., the auditors, were not authorized by the employment agreement to determine "net profit" for the purpose of compensating plaintiff, but were merely authorized to determine "net profit" for the corporation in general. But this cannot have been the intent of the parties.
The "net profit" of a corporation cannot be determined in a vacuum. Its precise meaning must be garnered from the context in which it is used. Thus, net profit for federal income tax purposes might be quite different from net profit for the purposes of a corporate financial statement. The agreement here in question itself indicates the context of the subject matter with which the parties were dealing, and may be resorted to in aid of ascertaining their intent with respect to "net profit."
The agreement took the form of a letter from the brother of defendant's president, apparently acting as attorney and agent for the company. It begins:
"In connection with our plans to operate the Peninsula House as a beach club and motel, this will confirm our understanding of the arrangements between us:
(1) You will enter into the employ of Peninsula House, Inc., as manager of the operation for the current calendar year and from year to year thereafter, subject to termination by either party as of December 31 in any year * * *."
Then follows paragraph 2, quoted above. The third paragraph states that plaintiff would not incur any obligations on behalf of the corporation for capital improvements, nor obligations for unpaid operating expenses aggregating more *347 than $5,000 at any one time, without prior written consent of a director of the corporation. Paragraph 4 provides that all monies received by him on behalf of the corporation were to be deposited promptly at the local bank, where the corporation would maintain a special account with a maximum balance of $5,000 upon which he could draw for corporate expenses. The next paragraph, relating to the company's right to sell its property at any time, with the option in plaintiff to buy if the offer was less than $190,000, has already been considered by us in the first section of this opinion.
The agreement clearly relates to the hotel operation, and to nothing else. Plaintiff's right to share in any profit made from the sale of corporate property is pinpointed and limited to the hotel premises, described as a "beach club and motel." To conclude, as did the trial judge, that he was entitled to share in an entirely separate asset of the corporation, the Elliott property, is to read something into the employment agreement which is not there and thus write a new contract for the parties.
It seems entirely clear that the parties had three purposes in mind: (1) to provide an incentive to plaintiff as manager of the hotel business to build up an operating profit by permitting him to share in the fruits of his efforts in that direction; (2) to permit him to share in any profit resulting from the sale of the Peninsula House for a sum exceeding $190,000; and (3) to give him first refusal if the company received an offer to purchase the property for a lower sum. The very fact that the agreement provided for what should be done in the event that the hotel property was sold is the strongest kind of indication that the profit-sharing arrangement otherwise contemplated only an operating profit.
We find no ambiguity in the term "net profit" considered in the context of the agreement. But were there any ambiguity, the parties expressly stipulated that the company's independent auditors were to determine the net profit during *348 each calendar year, and that such determination "shall be conclusive."
We must conclude that if the stipulation of the parties is to be given any reasonable meaning, they intended that the auditors determine the net profit for the purposes of the employment agreement, and this determination was to be binding. This does not mean that the determination of the auditors is conclusive in the sense that it is not subject to judicial review. It merely means that their decision will be upheld in the absence of bad faith or an unreasonable departure from approved accounting practices. Roberts v. Eastland Food Products Co., 323 Mass. 466, 82 N.E.2d 798 (Sup. Jud. Ct. 1948); Pollack v. Carlye Dress Corp., 76 F. Supp. 755, 759 (D.C.E.D. Mo. 1948).
The auditors were not arbitrators in the strict sense of the word, but were selected merely to avoid possible controversy. And although their determination is subject to judicial review and correction, it should stand, absent fraud, bad faith or palpable error equivalent to bad faith, or an obvious erroneous construction. See Heller v. Boylan, 29 N.Y.S.2d 653 (Sup. Ct. 1941), affirmed 263 App. Div. 815, 32 N.Y.S.2d 131 (App. Div. 1941), appeal denied 263 App. Div. 852, 32 N.Y.S.2d 1011 (App. Div. 1941); see, generally, Annotation 49 A.L.R.2d, above, at page 1156 (1956); cf. Koppelman v. Raritan Homes, 31 N.J. Super. 454, 458 (App. Div. 1954).
When Francis J. English, a certified public accountant in the employ of Harris, Kerr, Forster & Co., attempted to explain how the determination of net profit was arrived at, the trial judge prevented it. His refusal to admit into evidence the formal determination of the auditors as to corporate net profit for the purposes of the employment agreement, and their reasons therefor, was reversible error. This offer of proof by defendant was relevant and proper. It is clear from the record that the auditors concluded there was no net corporate profit for the purposes of the agreement, *349 defendant having suffered a net loss of $6,120.22 in the operation of Peninsula House.
True, some profit-sharing contracts contain clauses expressly excluding non-operating income from gross revenues. See Washington, "The Corporation Executive and His Profit-Sharing Contract," above, 50 Yale L.J., at page 52. However, this does not necessarily mean that in every instance where such income is not expressly excluded, the parties did not intend to exclude it. This principle is illustrated by such cases as Sidney Smith, Inc. v. Steinberg, 316 S.W.2d 243 (Mo. Ct. App. 1958); Sweeney v. Earle C. Anthony, Inc., 128 Cal. App.2d 232, 275 P.2d 56 (D. Ct. App. 1954). Other cases which have implied an exclusion of non-operating income in ascertaining gross revenue for purposes of computing net profit in profit-sharing agreements are Boradori v. Peterson, 86 Cal. App. 753, 261 P. 520 (D. Ct. App. 1927); Boisnot v. Wilson, 109 App. Div. 569, 96 N.Y.S. 581 (App. Div. 1905), affirmed as modified below 186 N.Y. 593, 79 N.E. 1101 (Ct. App. 1906); Amsdem v. Dunham, 78 App. Div. 33, 78 N.Y.S. 989 (App. Div. 1902). And see, generally, Annotation 49 A.L.R.2d, above, at page 1133.
Accordingly, in the context of the profit-sharing arrangement here in question, the purpose of which was to create a direct relationship between plaintiff's performance as hotel manager and his compensation, thereby providing him with maximum incentive to produce a favorable operating result (see Note, 51 Colum. L. Rev. 867 (1951), and 49 A.L.R.2d, at page 1131, above), we hold that a reasonable interpretation of "net profit" requires that it be limited to those profits related to plaintiff's specific function in managing the beach club and motel. It cannot include capital gains wholly unrelated to that aspect of the business with which plaintiff was concerned. The auditors therefore properly excluded the capital gain on the sale of the Elliott property from their determination of net profit under the employment agreement.

*350 III.
There remains to be considered the auditors' inclusion of auditing fees for 1957 as a deductible expense in computing the net profits for 1958, and this without regard to whether the accounting fees for 1957 were fully determinable at the end of 1957. What the auditors did was to treat auditing fees for 1957 on a cash rather than on an accrual basis. This explains their inclusion of $1,988.85 in the company's expenses for 1958  a palpable error calling for judicial correction.
In interpreting a profit-sharing agreement, it has been held that losses incurred in a year preceding the one covered by an annual settlement cannot be charged against profits actually made in the year covered by such annual settlement. Morehouse v. John M. Kelly Contracting Co., 95 N.J. Eq. 280, 285 (E. & A. 1923). In other words, the computation of net profits for the purposes of the profit-sharing agreement should be made on the basis of an accrual system of accounting rather than a cash system. Of course, the parties may stipulate to the contrary, but where they have not done so, expenses should be charged to the year in which they were incurred.
We doubt that the parties ever intended that the operating profit of 1958 would be diminished by a corporate obligation incurred for services rendered prior to that year. It seems unreasonable that they would have in mind that plaintiff should thus mortgage his share in the prospective profits of an operation which he had not yet undertaken. (It is to be recalled that the employment agreement was executed in March 1958.)
However, plaintiff gains nothing from this conclusion. Defendant is correct in pointing out that if auditing fees incurred in 1957 cannot be charged against 1958 gross revenues, it is entitled to have auditing fees incurred in 1958 charged against the gross revenues for that year, since these likewise must be treated as accrued. At the oral argument *351 plaintiff's counsel conceded that if we decide that the profit from the Elliott property sale may not be included in the calculation of net profits for 1958, the accounting fee issue is academic. Although it is not a matter of record, we are informed that the 1958 auditing fees of Harris, Kerr, Forster & Co. amounted to slightly over $2,000. Since, as we have determined, defendant's net profit for 1958 cannot include the gain on the sale of the Elliott property, there was a $6,120.22 net loss. To include the 1958 auditing fees as an expenditure for that year would only increase this red figure.
We affirm so much of the judgment on appeal as dismissed plaintiff's complaint for specific performance, with prejudice. We reverse the judgment entered in plaintiff's favor in the sum of $3,730.27 plus interest and costs. We therefore direct that judgment be entered in favor of defendant, and remand the case for that purpose.