## MILLER v OMAR BAKING CO

Ohio Appeals, 2nd Dist, Franklin Co

No 2686. Decided April 14, 1937

Paul M. Herbert, Columbus, for plaintiff-appellee.

Huggins & Liggett, Columbus, for defendant-appellant.

## OPINION

By BARNES, P.J.

The above entitled cause is now being determined on proceedings in error, through defendant's appeal, on question of law. The action is one for malicious prosecution, in which damages were prayed for in the sum of $10,100.00. The jury returned a verdict for the full amount.

On motion for new trial, the court granted a remittitur of $4500.00. The same being accepted by the plaintiff, motion for new trial was overruled and judgment entered for $5600.00.

The following brief summary of facts is requisite to an understanding of the nature of the controversy:

The Omar Baking Company is a corporation, having its Ohio place of business in Columbus, Ohio. It was a large manufacturer of baked goods, distributing its product by house to house deliveries and also by stores. It had about one hundred thirty-five different routes, located in Columbus and in other cities throughout Ohio. One of its units operated at Lancaster, Ohio, where it maintained a store and some fifteen routes operating therefrom. The plaintiff, Horton Miller, had charge of this store at Lancaster, Ohio, and supervision over the various routes extending out from this city.

Miller had previously been employed by the company, first at Newark, Ohio, and afterwards in Columbus, Ohio. He went to Lancaster in November of 1931. His official title was that of supervisor. The Lancaster store and nine routes therefrom had been in operation before Miller took charge. Thereafter and before August 2 of the following year six additional routes were put in operation.

The general plan was to employ a man on each route, such employee furnishing his own truck for distribution of the baked goods from door to door.

A supply of these baked goods was brought down from Columbus each morning and distributed to the drivers of the several routes for their anticipated day's requirements. The baked goods not sold on the routes were returned by the drivers to the store, and there disposed of the following day as day old goods at one-half price. Each driver was charged on the basis of the retail price for the goods placed in his truck each day. There were furnished the drivers of these trucks printed slips or books for entering his individual transactions. When he returned in the evening he would have his cash, accounts receivable, soliciting accounts and, if not sold out entirely, the balance of the baked goods. These credits should always balance with the charge. Each of the drivers would then make up what was designated as a salesman's settlement sheet for each day, wherein would be carried all of the above data. The cash and salesman's settlement sheet would then be placed in a canvas bag, properly marked, and picked up by the driver of the big truck when he would come down with a supply of goods for the following day. Under this plan it might be said that the settlements on the established routes were made directly to the home office in Columbus. Miller, the supervisor, would check and receive in the store the baked goods not sold. The disposition of these returned unsold goods to the store was his responsibility. After Miller was placed in charge as such supervisor, he started to build up new routes, and before August of the following year he had six such new routes in operation. The general plan in establishing new routes was for Miller himself to lay out the new route and operate it himself for a period of a few weeks until such time as he had worked up sufficient business to interest some individual in taking it over and operating it under the same general plan as above. These several salesmen on all the routes were paid a salary with an alternative commission when the business of the route had worked up to the point where the commission would meet the salary agreement.

When Miller first took charge of the Lancaster store, his immediate superior was a Mr. McCarthy. McCarthy severed his connection with the company in May, 1932, a few months prior to the discharge of plaintiff in August, 1932. During the period of McCarthy's administration, each of the salesmen on the several routes carried his own account, and under the bookkeeping system of the company these accounts were charged to the individual salesman at the end of each week under the heading of a credit loss. Of course, it was to the interest of these salesmen to be very careful of their credits and collect up promptly before the customer's accounts grew too large.

When Miller started out to establish new routes and in the first weeks drove them himself, he would follow the same formula in his daily settlements on his prospective route as did the other salesmen. In the very nature of things the total of the cus-

tomers' accounts was built up from day to day, unless the salesman was very careful in extending credit and also with his collections. When the supervisor, Miller, would turn over the route that he started, the new salesman on the route would receive the book that Miller had used on the route, and the first settlement would be a continuation from Miller's last settlement sheet. The totals would be made up from the individual customers' sheets, always in the possession and control of the salesman. Under this plan it would necessarily follow that when a new salesman came on the route that the supervisor, Miller, had opened up, he would inherit the uncollected accounts.

Some time in May, 1932, Mr. Elmer Neudecker succeeded McCarthy as sales manager of the defendant, The Omar Baking Company. After a time Mr. Neudecker became suspicious that something was wrong at the Lancaster unit and immediately started an investigation. After the completion of this investigation, taking some two or three weeks' time, Miller was discharged and an affidavit was filed against him in the Municipal Court of Columbus, Ohio, charging him with the crime of embezzling $1265.93. A warrant was issued on the affidavit; Miller was arrested at his home in Lancaster and held in jail for a period of nineteen hours. On his arraignment he entered a plea of not guilty and gave bond for his appearance. A hearing was had in the Municipal Court, after which the defendant, Miller, was bound over to the grand jury. At the next session of the grand jury an indictment was returned, charging the defendant, Miller, with embezzlement in the sum of $195.00. This indictment was nolled by reason of some imperfection and thereafter a second indictment was returned on the same evidence, again charging embezzlement of $195.00. The bonding company executing the bond to The Omar Baking Company for Miller's faithful performance made payment in the sum of $661.74. Subsequently the indictment was nolled on application of the Prosecuting Attorney and upon the order of the Common Pleas Court having charge of the Criminal Division.

Miller filed his petition against the defendant for malicious prosecution on January 27, 1934. After the issues were joined, trial was had, resulting in judgment for the plaintiff as heretofore stated.

Appellant's assignment of errors sets forth the claims under three general headings, as follows:

1. The Common Pleas Court erred in overruling motion for judgment in its favor non obstante veredicto.

2. The Common Pleas Court erred in overruling appellant's motion for new trial, which was based on the following grounds, i.e.:

(Then follow eleven separate specifications of error).

3. Other errors appearing upon the face of the record.

Under the first assignment of error, if sustained, a final judgment would be entered in this court.

Under the second and third grounds, if sustained under any of the claimed specifications of error, a new trial would be ordered.

Otherwise, the judgment of the lower court will stand.

In considering the claimed errors we must start with the proposition that the judgment of the trial court is presumptively right and free from prejudicial error. Before the judgment can be reversed, it must affirmatively appear that there was prejudicial error in some of the specifications set out under the assignment of errors.

Counsel for appellant, in their brief very strenuously and earnestly urge that the trial court was in error in not directing a verdict and later, in not sustaining motion for judgment non obstante veredicto.

The law of Ohio relating to actions for malicious prosecution is rather well defined, and there does not appear to be any substantial conflict in the law of the instant case as it relates to assignment of error No. 1.

The entire subject of malicious prosecution is presented as a text in 25 Ohio Jurisprudence, from §§1 to 85, inclusive. The text is built up from the reported cases in our Ohio courts and so far as we are able to observe the text is supported by the cited decisions. Commencing at §4 and extending to §35, inclusive, will be found in order the essential elements requisite to the sustaining of an action for malicious prosecution.

The first six witnesses called on behalf of the plaintiff directly presented certain requisite proof on some of the essential elements, but none of these touched the question of malice or probable cause, both of which are likewise essential elements. On these elements the only witness present-

ed on behalf ,of the plaintiff was the plaintiff himself.

Malice is defined to be of two kinds, i.e., express or implied.

Express malice is generally referred to where there is an ill will or hatred; the promptings of a bad heart or improper motives.

Implied malice arises from proof of a wrongful act intentionally done without just cause.

**Headnote 5.** The absence of reasonable cause is the real gist of an action for malicious prosecution. Probable cause is defined as a reason- able ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.

Ash v Marlow, 20 O. 119.

Melanowsky v Judy, 102 Oh St 153.

The elements of malice and probable cause are so closely related that they will be discussed together. In the trial of the the case the burden was upon the plaintiff appellee not only to prove malice, but want of probable cause.

It is the contention of the appellant that there was the absence of malice, and, further, that the undisputed evidence presents a case of probable cause. These questions may only be determined through a very careful examination of the record.

Plaintiff appellee in a measure was in the position of being required to prove a negative. By reason of this fact his examination in chief would, in the main, be directed to a chronological recital of his administration and the pertinent facts connected with his arrest, followed by a general statement that he did not embezzle anything at any time from his employer. In his cross-examination there was brought out in detail many of the pertinent elements bearing on the question of malice and probable cause.

While the burden at all times remains with the plaintiff, yet there naturally appears in defendant's presentation of its evidence the detailed information upon which the prosecution was based.

Searching the transcript of evidence, we fail to find any evidence of express malice.

Mr. Elmer Neudecker, sales manager of the defendant company, was the one filing the affidavit against the plaintiff. Prior to his coming to The Omar Baking Company, in May, 1932, he had never previously known the plaintiff. So far as is disclosed from the record, there had been no unpleasantness between Miller and Neudecker prior to the starting of the investigation. No inference of malice would arise from the mere fact that he had started an investigation. If, for any reason, his suspicions were aroused, it would be his duty to investigate. The fact that he took two or three weeks to make his investigation would urge against malice rather than support it. It also appears that he was in very frequent conference with the representative of the Bonding Company and also the attorney for the Baking Company. The real question is whether or not, after he made his investigation, he had before him such a state of facts as would warrant a reasonably prudent man in arriving at the conclusion that the plaintiff was probably guilty of embezzlement.

We now briefly, without too much detail, refer to what information the record discloses he had before filing the affidavit charging the plaintiff with embezzlement.

He contacted most, if not all of the salesmen on the various routes. According to his testimony, he found nothing wrong on any of the nine routes in operation before Miller was employed. On the routes started by Miller and afterwards turned over to salesmen who were operating at the time of the investigation, he had evidence of some apparent irregularities. Several of these salesmen signed statements which were introduced in evidence, to the effect that when the route was turned over to them by Miller he had carried names on the list of customers that never existed. These several names were carried as debtors to the respective routes. They were debtors in substantial amounts. If these statements of the drivers were true, the effect on the financial set-up is obvious. It also appears that Mr. Neudecker requested Mr. Miller to run a tape on certain routes. By this was meant an adding machine tape. The same was run and forwarded to the Columbus office. Mr. Neudecker then had the office send two men down to check and they found a variance of some $200.00.

As a further check, Mr. Neudecker requested the office manager, Mr. E. H. Pfleiderer, to obtain for him from the office files the total amount of baked goods returned to the store at Lancaster by the salesmen out of their unsold goods. This amounted at the regular retail price to approximately $4000.00. These baked goods

were then to be sold as day old goods at half price, or approximately $2000.00. The company had received from Miller from sales at the store only $268.42. The record discloses no disposition of the remainder. Mr. Miller, in his testimony, makes the claim that Mr. McCarthy, the former sales manager, authorized him to give away baked goods to various organizations in Lancaster in order to build up good will. He testifies that in furtherance of this authority, he gave large quantities of bread to a soup kitchen being operated to feed the unemployed; also to lodges, churches and other institutions. He had no records supporting this contention, nor did he claim that any such records were sent in to the home office in Columbus. Claim is also made by Mr. Miller that he was instructed by Mr. McCarthy to get the goods out and to close every avenue of competition. That in furtherance of this plan, he was authorized to give away baked goods in soliciting on the routes and much of the products were disposed of in this way. However, soliciting accounts were generally sent in and were allowed as credits. It is the claim of the defendant company that none of these soliciting charges or credits entered into the claimed shortage of $1265.00. It was also suggested by Miller or his counsel that the unpaid customers' accounts were included in what the company determined to be a shortage. The officers of the company deny this and say that not one cent of customers' accounts entered into the total. Some of the items entering into the total charge of $1265.00 seem to be satisfactorily explained by the plaintiff. It would not be correct to say that the defendant appellant must be 100 per cent. correct in its total. If there is probable cause to support any amount, then plaintiff would not have a cause of action. There are many other details that might be referred to, but to do so would unnecessarily lengthen this opinion. Suffice to say that we have read and reread the record and we did not find it easy to analyze.

The writer of this opinion is of the opinion, considering the record as a whole from the undisputed testimony, that probable cause is shown for instituting the criminal action by the defendant company. Neither do I think the evidence warrants the finding of malice either express or implied. Arriving at this conclusion, I think we should enter final judgment on the ground that the trial court should have directed a verdict in favor of the defendant and also sustained the motion for judgment non obstante veredicto.

In this conclusion my associates do not concur and hence we must pass to the second assignment of error set out as follows:

"II. The Common Pleas Court erred in overruling appellant's motion for new trial which was based upon the following grounds, i.e.:

(1) Irregularity in the proceedings of the jury.

(2) Excessive damages appearing to have been given under the influence of passion or prejudice.

(3) The damages given by the jury were excessive.

(4) Accident and surprise which ordinary prudence could not have guarded against.

(5) That the verdict was not sustained by the weight of the evidence and the law.

(6) That the verdict of the jury was contrary to the law.

(7) The court erred in rejecting evidence offered by the defendant, to which the defendant objected and excepted at the time.

(8) The court erred in admitting evidence of plaintiff over the objection of the defendant, to which the defendant at the time excepted.

(9) The court erred in charging the jury.

(10) Error of law occurring at the trial and objected to at the time by the defendant.

(11) Other errors appearing upon the face of the record."

Many of these separate assignments of error are grouped in the briefs and no attempt was made to follow the order in which same were set out under the assignments of error.

We have examined each and every specification, but do not deem it necessary to discuss in detail each and every one of the specifications.

ARE THE VERDICT AND JUDGMENT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE?

Two of the members of the court think the judgment should be reversed on this ground, but in this conclusion the third member does not concur. By virtue of the provision of **Article 4, §6 of the Ohio Constitution** this court may not reverse on the weight of the evidence except by unani-

mous concurrence of the court. It therefore follows that the judgment may not be reversed on the weight of the evidence.

## EXCESSIVE DAMAGES APPEARING TO HAVE BEEN GIVEN UNDER THE INFLUENCE OF PASSION AND PREJUDICE.

As heretofore indicated the jury returned its verdict for $10,100.00, being the full amount prayed for under the petition. The jury attempted to return a prior verdict which the trial court found to be improper and in the presence of counsel ordered the jury back for further deliberations after giving them some pertinent instructions. Under the first proffered verdict they returned an amount in favor of the plaintiff in the sum of $10,000.00 and attorney's fees. The jury were instructed by the court that they could not return a verdict in this form, the words "and attorney's fees" being objectionable. The jury were told that they must return a lump sum and that the total might not exceed the ▮▮▮▮▮▮▮ amount prayed for, to-wit, $10,100.00. Claimed error is predicated upon this procedure, but we do not so find.

The trial court found the verdict returned to be excessive and ordered a remittitur of $4500.00. This amount was accepted by the plaintiff, whereupon motion for new trial was overruled and judgment for $5600.00 was entered. The law is well defined that both the trial and ▮▮▮▮▮▮▮ the reviewing court are permitted to correct excessive verdicts where it is determined that the verdict was not actuated by passion and prejudice.

The Supreme Court of Ohio has had difficulty in unanimously arriving at a proper rule to govern where the jury return excessive verdicts. The last announcement will be found in the case of **Fromson & Davis Company v Reider, a minor, 127 Oh St 564**, Matthias, J., dissenting from the majority opinion. The minority view in this and other like cases, particularly **Chester Power Company v Schulte, Admr., 120 Oh St 273**, urge that a verdict returned in double the maximum amount found by the Court of Appeals to have been supported by the evidence is of itself sufficient evidence upon which to base a finding of passion and prejudice. The majority rule is set out in the third syllabus of **127 Oh St 564**, supra, and reads as follows:

"3. In order to determine whether excessive damages were so influenced, a reviewing court should consider, not only the amount of damages returned and the disparity between the verdict and remittitur where one has been entered, but it also becomes the duty of such court to ascertain whether the record discloses that the excessive damages were induced by (a) admission of incompetent evidence; (b) by misconduct on the part of the court or counsel, or (c) by any other action occurring during the course of the trial which could reasonably be said to have swayed the jury in determining the amount of damages that should be awarded."

We now proceed to analyze the instant case under the rule set out in syllabus 3 above quoted.

We have no difficulty in arriving at the conclusion that the amount of the verdict was excessive. The trial court so held and ordered a remittitur which was agreed to by the plaintiff. The amount of the remittitur was very substantial but there still remains a judgment of $5600.00 which is rather large in an action of this character.

In 18 R.C.L. at page 11 we find the following:

"The action for malicious prosecution is not favored in law, and hence has been hedged about by limitations more stringent than those in the case of almost any other act causing damage to another, and the courts have allowed recovery only when requirements limiting it have been fully complied with. The disfavor with which the action is looked upon is especially marked in cases where the suit is being brought for the institution of criminal proceedings against the plaintiff, as public policy favors the exposure of crime, which a recovery against a prosecutor obviously tends to discourage."

We now consider the elements specified under syllabus 3 and discuss them in reverse order. For this purpose we again quote.

"(c) by any other action occurring during the course of the trial which could reasonably be said to have swayed the jury in determining the amount of damages which should be awarded."

We find in the record several incidents which we think have such an effect. We refer to only one which in and of itself is sufficient.

Counsel for the defendant in presenting its case offered in evidence written statements of drivers on certain routes in effect that the plaintiff Miller in turning over routes to them had listed the names of claimed debtor customers some of whom never existed. This evidence was admitted and unquestionably competent as bearing on the question of probable cause. These purported signed statements are attached to the record as exhibits.

Counsel for plaintiff made repeated efforts to have presented in evidence sworn statements of some of these same drivers touching this same question.

The court very properly refused the admission of this testimony, but the colloquy between counsel and the court in the presence of the jury unquestionably could have no other tendency than to leave the impression with the jury that these drivers of routes were challenging the correctness of the written statements introduced in evidence by the defendant. There should be no difficulty in arriving at the conclusion that this proffered testimony was incompetent. The trial court recognized the prejudicial character of this proffered evidence and at one state of the proceedings stated to counsel that his insistence on its introduction was jeopardizing any possible verdict that might be returned in his favor. The substance of this evidence may have been competent, but it could not be introduced through affidavits. The drivers might have been subpoenaed as witnesses and thereafter interrogated as to their having signed the statements which defendant introduced in evidence, or their depositions might have been taken. No other method is recognized under the law for presenting evidence in the trial of a lawsuit. It was urged in the hearing of the jury that the affidavits of these drivers should be of more force than signed statements. Abstractly this is a truth that may not be disputed. However, the court was dealing with the proper method of directing a lawsuit. The signed statements were competent evidence upon the question as to one of the elements upon which the defendant acted in instituting the criminal action. We might make the further comment since the case is to be retried that these driver witnesses, even if present would not be permitted to testify that the statements which they signed were untrue. If they voluntarily signed them and delivered them to the representative of the defendant company, the truthfulness of the statement would not be in issue unless it be shown that the representative of

the company knew they were untrue or had reasonable grounds to so understand.

What would be competent evidence in a criminal action against Miller is quite different from what would be competent evidence in the action against the defendant for Miller's prosecution.

Throughout the trial there was also an over-emphasis on the fact that McCarthy, a former superintendent, was not called by the defendant as a witness or his deposition taken. McCarthy was the superintendent employing Miller in the first instance at the Lancaster Unit, and also was his superior until a short time prior to Miller's discharge. We must not lose sight of the fact that the burden in the instant case was upon Miller. McCarthy was no longer in the employ of the defendant company. The question might be asked with equal emphasis why did not Miller call McCarthy or take his deposition. The nature of the instant case is such that it would be very difficult for a jury to understand the significance of the burden of proof.

Coming now to subdivision (b) of syllabus 3 which reads as follows: "By misconduct on the part of the court or counsel." We find nothing in the record suggesting any misconduct of the court.

As to misconduct of counsel, we accept the statement of counsel for plaintiff that he considered the evidence competent and was endeavoring to make up his record; that the evidence was incompetent in our judgment is clearly established. The damaging effect was just as potent as though counsel understood it to be incompetent.

The last element mentioned is under (a), "Admission of incompetent evidence." We do not find any such.

On the question of complained error on introduction and admission of testimony we are unable to find any prejudicial error on this ground.

We think the charge of the court as a whole was free from error and very clearly and learnedly stated the issues to the jury. We find no other prejudicial error.

For the reasons stated that the verdict is excessive and prompted by passion and prejudice, the judgment of the trial court will be reversed and the cause remanded for a new trial.

Exceptions will be allowed.

GEIGER, J, concurs.

HORNBECK, J, dissents.

## DISSENTING OPINION

By HORNBECK, J.

The majority has determined that the judgment is based upon a verdict that was returned by the jury under the influence of passion and prejudice. It is a little difficult to determine just what reason supports the conclusion reached.

The third syllabus of **Fromson & Davis Co. v Reider, a Minor, 127 Oh St 564** is quoted and **Chester Park Co. v Schulte, Admr., 120 Oh St 273** cited but the second syllabus of Fromson & Davis Co. v Reider is also the law, as announced by the majority of the court, as follows:

"A remittitur amounting to fifty per cent. of the verdict does not furnish conclusive proof that excessive damages were 'given under the influence of passion or prejudice'."

It is obvious that under this test the verdict could not solely because of the amount of the judgment be determined to be returned under the influence of passion and prejudice, for two reasons: first, it was not reduced by 50 per cent., and second, if it were that does not establish passion and prejudice. Even under Judge Matthias' dissenting opinion the amount of the reduction of this verdict would not compel a finding of passion and prejudice.

It must be assumed that the trial judge observed the law and used sound discretion in ordering a remittitur and that in so doing he expressly found that no passion and prejudice provoked the verdict. The majority opinion says, this action of the trial court is presumptively right but overcome by the record. I find nothing of sufficient import in the evidence to support the conclusion that the trial judge misconceived his obligation under the law.

The general charge permitted the jury to assess punitive damages if the evidence supported it and if there was no such evidence this charge was incorrect. The majority opinion does not hold that the court improperly charged punitive damages. The amount of such damages which can be awarded is not susceptible of nice determination and the majority is using a fine measuring stick when it says that a verdict for $10,000.00 in this case was clearly stimulated by passion and prejudice.

The compensatory damages in this case could properly have been fixed at a considerable sum.

If the plaintiff was telling the truth, and the jury had a right to believe him, he explained to Neudecker, the sales manager, the reason for the so-called shortage, and that it had been incurred in carrying out the express instructions of the former manager, McCarthy. Without respect to the question of burden or proof there was nothing improper in urging to the jury that before criminal action should have been taken it was the obligation of the new manager to contact the former manager and learn if the statements of the plaintiff were true and further that if McCarthy had not authorized the disposal of the supplies why did not the defendant show that fact by McCarthy.

Upon the whole record the judgment should be affirmed.